792 P.2d 945

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Todd HORSLEY, Defendant–Appellant.**

**No. 17605.**

Supreme Court of Idaho.

April 26, 1990.

Bruce H. Greene, Sandpoint, for defendant-appellant.

Jim Jones, Atty. Gen., Lynn E. Thomas, Sol. Gen. (argued), Boise, for plaintiff-respondent.

JOHNSON, Justice.

This is a criminal case. The issues presented are:

1. Is a minute entry signed by the judge sufficient to dismiss a criminal case?

   Under the circumstances of this case, we hold that it is not.

2. Is an order dismissing a criminal case nunc pro tunc effective to dismiss the case as of a prior date, where the judge announced his intention to dismiss the case on the prior date and where an order carrying out this intent was not entered through inadvertence?

   We hold that the nunc pro tunc order is effective to dismiss the case.

3. Was any violation of I.C. § 19–3501(2) proved by Horsley?

   We hold that no violation of I.C. § 19–3501(2) was proved.

4. Is an affidavit from the director of a private laboratory reporting the results of DNA-based genetic tests on body fluids admissible under I.C.R. 5.1(b) as showing the existence or non-existence of "medical facts or records?"

   We hold that the affidavit is not admissible.

5. May hearsay evidence be admitted under I.R.E. 803(24) when there are not specific findings that each of the five requirements of the rule have been fulfilled?

   We hold that the hearsay is not admissible.

## I.

### THE BACKGROUND AND PRIOR PROCEEDINGS.

In April 1987 a woman was raped in her home in Sandpoint by an intruder. The victim promptly reported the rape and was given an examination to determine the presence of evidence of the perpetrator's identity. Semen was identified in the vaginal secretions that were taken from her. She also gave a sample of her blood.

Todd Horsley had previously lived next door to the victim, but had moved before the rape. Suspecting that Horsley was the perpetrator, police officers went to his home. They told Horsley that he was suspected of raping a woman. They asked him if he was willing to take a blood test in order to exculpate himself. Horsley voluntarily gave the officers a sample of his blood.

The police sent blood samples of the victim and Horsley and vaginal secretions of the victim to Lifecodes Corporation in the state of New York. Lifecodes is a private DNA-based genetic diagnostic and research laboratory that uses the DNA–PRINT identification test to identify and compare body tissues and fluids. The test takes the biological evidence and examines it at its most fundamental level—the deoxyribonucleic acid (DNA) molecule—to uncover the genetic code of the person whose tissue or fluid is being tested.

The director of Lifecodes' clinical laboratory sent an affidavit to the police stating that he oversaw the conduct of the "scientific analysis" of the samples sent to Lifecodes by the police and authored a report attached to the affidavit. The report stated that the DNA–PRINT pattern seen in the vaginal secretions of the victim matched the pattern from Horsley's blood sample. The report concluded: "This pattern would occur in the population in 1:12,-678,667."

A criminal complaint was filed charging Horsley with raping the victim. A preliminary hearing was held at which the affidavit of the director of Lifecodes' laboratory was admitted over Horsley's objection. Horsley was bound over for trial. An information was filed on August 26, 1987 (the first case). Trial was set to begin on December 15, 1987.

Horsley moved to suppress the results of the analysis by Lifecodes of the blood samples and vaginal secretions. On December 10, 1987, a hearing was held on the motion. At the conclusion of the hearing, the trial court denied the motion to suppress. An issue also arose in the hearing concerning whether defense counsel had received background materials about Lifecodes. The prosecutor then stated:

I advised [defense counsel] in court today, that I will not know until tomorrow morning because of the delay in time awaiting this motion hearing as to whether or not Dr. Baird and his supervisor are available from Lifecodes. I anticipate they will be but I cannot give that guarantee because I could not make the financial obligation requirements to guarantee the days at trial. Collateral to that if we are going to have a challenge to that or request for continuance for the defense based on [defense counsel's] representation that he has not received Lifecodes material, I think it's something that needs to be addressed today or tomorrow. I don't want to spend a couple thousand dollars of taxpayers money to have the people get here and five-hundred dollars a day.

While they were still in the hearing, the prosecutor delivered the background materials about Lifecodes to Horsley's attorney, who then moved to suppress the materials. The trial court denied the motion and inquired whether there were any other motions. Horsley's attorney declined to move for a continuance. The judge said the trial would begin as scheduled on December 15th.

On December 14, 1987, the prosecutor moved to continue the trial until after January 1, 1988, on the grounds that the two essential witnesses from Lifecodes were not available to testify at the trial. Horsley objected to a continuance, and the trial

court denied the motion to continue. The prosecutor then moved to dismiss the case without prejudice to refiling the charge, on the ground that the state could not proceed "because of the unavailability of the witness or witnesses from the State of New York." Horsley's attorney objected on the ground that the motion was "just nothing but a motion to nolle prosequi to suspend prosecution," which he said had been abolished by statute in Idaho.

The trial court orally dismissed the case under I.C.R. 48: "The dismissal is without prejudice and the reason for the dismissal is the basis that the State has indicated that it is not prepared to proceed in the absence of a continuance and in the absence of the two witnesses from Lifecodes." The trial court directed the prosecutor to prepare an order for his signature. The court minutes of this hearing prepared by the deputy clerk note: "Court grants Prosecutor's Motion to dismiss in re Rule 48C—dismissal is without prejudice. Mr. Robinson [the prosecutor] to prepare Order." The district judge signed the minutes at the bottom of this page, which was the second of two pages of the minutes, opposite the printed words: "APPROVED as to Pages ___ through ___." No order of dismissal appears in the record until one signed by the district judge on April 21, 1988, on which is added in handwriting: "nunc pro tunc Dec. 14, 1987."

On December 17, 1987, the prosecutor signed a new complaint charging Horsley with the same crime as was charged in the first case. The complaint was filed on January 4, 1988, and a summons issued for Horsley to appear on January 19, 1988. Horsley was arraigned on January 19th. A preliminary hearing was held on February 3, 1988.

At the preliminary hearing on this new complaint the prosecutor offered in evidence the same affidavit of the director of Lifecodes' clinical laboratory that was admitted in the preliminary hearing in the first case. Horsley's attorney objected to the admission of the report attached to the affidavit on the ground that the report contained the results of a scientific examination of evidence which was not admissible under I.C.R. 5.1 as an exception to the hearsay rule unless the examination was made by a state or federal agency or official. The magistrate admitted the report under I.C.R. 5.1, as evidence showing "the existence or nonexistence of business or medical facts and records." The magistrate also found the source of the evidence to be credible, based on the testimony of a police officer and exhibits concerning the background of Lifecodes. Based in part on the Lifecodes report, the magistrate found probable cause to believe that Horsley had raped the victim and bound him over for trial.

On February 8, 1988, the prosecutor filed an information charging Horsley with raping the victim in April 1987 (the second case). Trial was set for May 10, 1988.

Horsley filed a motion to dismiss the new information on the ground that the state had denied him his right to trial within six months from the filing of the information as provided in I.C. § 19–3501. In support of the motion Horsley argued that (1) the first case was still pending because no order of dismissal had been signed or filed in the first case and (2) the second case was a duplicate of the first case and should not have been filed. He contended that dismissal of the second case would leave the same charge pending, but would allow him to protect his constitutional rights and remedies. He also argued that the conduct of the prosecution in dismissing the first case coupled with the refiling of identical charges had denied him due process of law and deprived him of speedy trial rights.

The trial court ruled that the first case had been dismissed since December 14, 1987, and directed the prosecutor to prepare an order dismissing the first case without prejudice, effective on December 14, 1987. The trial court denied the motion to dismiss on the ground that Horsley had not presented any evidence that he had been prejudiced by the delay in his ability to present a defense to the charge. The order dismissing the first case "nunc pro tunc Dec. 14, 1987" was signed by the district judge the same day.

Horsley then moved to quash the order binding him over for trial and to dismiss the information in the second case. The basis for this motion was the admission at the preliminary hearing of the report from Lifecodes. The trial court denied the motion on the grounds that the report was admissible at the preliminary hearing under both I.C.R. 5.1 and I.R.E. 803(24).

Horsley entered a conditional plea of guilty under I.C.R. 11(a)(2), reserving the right to challenge on appeal: (1) the trial court's denials of his motion to dismiss the information for lack of a speedy trial and because there was more than one action pending and (2) the trial court's refusal to quash the order binding him over for trial and refusal to dismiss the information after the admission of the report from Lifecodes in the preliminary hearing.

The trial court sentenced Horsley to a term of not less than three nor more than seven years and retained jurisdiction for 180 days. Pursuant to his conditional plea, Horsley's attorney filed a notice of appeal from the denial of the motions to dismiss and to quash.

While his appeal went forward, Horsley began to serve his sentence. At the conclusion of the period of retained jurisdiction, the trial court relinquished any further jurisdiction of the case without changing the sentence. Horsley personally filed a second notice of appeal in which he appealed from the order relinquishing jurisdiction.

The appeal was argued before this Court on April 5, 1988. At the argument we considered only the issues raised in the brief filed by Horsley's attorney based on the first notice of appeal. Subsequently, a brief prepared by Horsley himself was filed in which he raised issues related to the relinquishment of jurisdiction by the trial court.

Following the death of our colleague Justice Allan G. Shepard and the resignation of our colleague Justice Robert C. Huntley, the remaining three members of the Court were unable to reach a decision in this case. In September 1989 the Court, with two new members, agreed that this appeal would be

decided on the issues raised in the brief submitted by Horsley's attorney, based upon the briefs filed by the parties and upon the tape of the oral argument on April 5, 1989. By our decision today we express no opinion on the merits of the issues raised in the brief filed by Horsley himself. Those issues are moot in any event, because we vacate Horsley's conviction and sentence.

## II.

## THE MINUTE ENTRY SIGNED BY THE JUDGE WAS NOT SUFFICIENT TO DISMISS THE FIRST CASE.

Horsley asserts that the first case was not dismissed by the minute entry of the deputy clerk, approved by the district judge. We Agree.

■ Horsley contends that an order of the trial court must be in written form as specified in I.C.R. 12(c). That rule refers to the form of pleadings and documents in criminal proceedings. It requires that "[e]very ... order of the court shall be typed with black ribbon or produced by a computer or word processor type printer of letter quality on white paper...." The minute entry by the deputy clerk on December 14, 1987, that was signed by the district judge indicating his approval did not comply with this requirement.

Also, the minute entry approved by the district judge did not comply with the requirement of I.C.R. 48(b): "Order of dismissal. When a court dismisses a criminal action upon its own motion or upon the motion of any party under this rule, it shall state in the order of dismissal its reasons for such dismissal." The minute entry here merely stated: "Court grants Prosecutor's Motion to dismiss in re Rule 48 C (sic)—dismissal is without prejudice. Mr. Robinson [the prosecutor] to prepare Order." This minute entry did not comply with the requirement of I.C.R. 48(b), since it did not state the reasons for the dismissal.

More than seventy years ago this Court held that notations in court minutes do not

constitute a judgment from which an appeal may be taken. *State v. Barnard*, 13 Idaho 439, 90 P. 1 (1907). *Barnard* was cited in *State v. Mason*, 102 Idaho 866, 867 n. 2, 643 P.2d 78, 79 n. 2 (1982), for the proposition that "a minute entry reciting an order of the district court was not a judgment appealable to this Court." Our Court of Appeals cited both *Barnard* and *Mason* in *State v. Gissel*, 105 Idaho 287, 289, 668 P.2d 1018, 1020 (Ct.App.1983) (review denied), for the proposition that "a premature notice of appeal is a nullity and does not vest jurisdiction in the appellate court, notwithstanding a subsequently entered written judgment."

There is no indication in the opinion in *Barnard* whether the judge had signed the minute entry in question. However, we need not consider whether the signature of the judge in this case approving the minutes distinguishes this case from *Barnard*. Even if we were to construe the minutes as an order of dismissal, the order would be ineffective. It does not state the reasons for the dismissal as required by I.C.R. 48(b).

We conclude that Horsley could not have appealed from the "order of dismissal" to which the minute entry referred. Therefore, we hold that the minute entry was not effective to dismiss the first case.

AS TO PART II:

BISTLINE, JOHNSON, BOYLE and McDEVITT, JJ., concur.

BAKES, C.J., dissents.

### III.

THE NUNC PRO TUNC ORDER WAS EFFECTIVE TO DISMISS THE FIRST CASE AS OF THE DATE THE TRIAL COURT INTENDED TO DISMISS IT.

█ Although neither party has addressed the issue, because we have concluded that the court minutes did not constitute an order dismissing the first information, we must consider whether the order issued by the trial court on April 21, 1988, dismissing the first case nunc pro tunc December 14, 1987, was effective. We conclude that it was effective.

In *Ward v. Lupinacci*, 111 Idaho 40, 720 P.2d 223 (Ct.App.1986) (review denied), our Court of Appeals explored in depth the effect of nunc pro tunc judgments in civil cases. In *Westmont Tractor Co. v. Estate of Westfall*, 112 Idaho 712, 735 P.2d 1023 (1987), this Court discussed and adopted the principles concerning nunc pro tunc judgments formulated in *Ward*. The crux of the analysis of the Court of Appeals in *Ward* as adopted by this Court in *Westmont* was whether the court issuing the nunc pro tunc judgment had intended to grant it on the earlier date but had failed to do so due to accident, excusable oversight or mistake. 112 Idaho at 714, 735 P.2d at 1025. In *Westmont* we noted that in *Ward* the Court of Appeals focused on the lack of unfair prejudice to the other parties in allowing the entry of judgment nunc pro tunc. *Id.*

While this is a criminal case and *Ward* and *Westmont* were civil cases, we see no reason not to apply the same principles concerning nunc pro tunc judgments developed there to this set of circumstances. Applying these principles here, we hold that the order of April 21, 1988, dismissing the first case nunc pro tunc December 14, 1987, was effective as of the earlier date. It is clear from the record that the trial court intended to dismiss the first case on December 14, 1987, stated its reasons and directed the prosecutor to prepare an order to do so. It is also clear from the record that the failure promptly to enter a formal order dismissing the first case was due to accident, excusable oversight or mistake. In fact, the prosecutor told the trial court at the hearing on Horsley's motion to dismiss on April 18, 1988: "An order was prepared. I don't have that file here with me. I have the current file. Why it has not made its way to the filing, I do not know." The trial court asked the prosecutor to determine whether an order for dismissal was "floating around somewhere," and if not to prepare one effective December 14, 1987.

The only evidence of prejudice that Horsley offered because of the delay in the dismissal of the first case was that his bond had not been exonerated. However, since his testimony was that he had furnished the bond through a bondsman for a premium of ten percent, we are unable to see what prejudice there was to Horsley. The premium is usually not refundable. No evidence was offered to show that Horsley would have been entitled to any refund upon exoneration of the bond. The attorney fees that Horsley testified he had incurred were in connection with the second case, not the first case.

AS TO PART III:

BAKES, C.J., JOHNSON, BOYLE and McDEVITT, JJ., concur.

BISTLINE, J., dissents.

## IV.

### THERE WAS NO VIOLATION OF I.C. § 19–3501(2).

■ Horsley asserts that under I.C. § 19–3501(2) he should have been tried within six months from the date the first information was filed. We disagree.

I.C. § 19–3501 (1987) states:

The court, unless good cause to the contrary is shown, must order the prosecution or indictment to be dismissed, in the following cases:

....

2. If a defendant, whose trial has not been postponed upon his application, is not brought to trial within six (6) months from the date that the indictment or information is filed with the court.

Since we have concluded that the first information was dismissed as of December 14, 1987, this statute was not violated by the lack of a trial within six months of the filing of the first information. Horsley acknowledges that if a felony case is dismissed pursuant to I.C.R. 48(a)(2), the six month requirement of I.C. § 19–3501 is renewed upon the refiling of the charge. This is consistent with our decision in *State v. Goodmiller*, 86 Idaho 233, 386 P.2d 365

(1963). In *Goodmiller* the original information was dismissed on motion of the prosecutor because a material witness was unavailable. More than a year later a new information was filed. This Court affirmed the denial of a motion to dismiss brought by the defendant both on constitutional speedy trial grounds and under I.C. § 19–3501. We held that when an information has been dismissed under I.C. § 19–3504 "in furtherance of justice," the dismissal was not a bar to another prosecution commenced within the period of the statute of limitations.

AS TO PART IV:

BAKES, C.J., JOHNSON, BOYLE and McDEVITT, JJ., concur.

BISTLINE, J., dissents.

## V.

### THE RESULTS OF A DNA–BASED GENETIC TEST OF BODILY FLUIDS ARE NOT ADMISSIBLE AS MEDICAL FACTS IN A PRELIMINARY HEARING BASED ON THE AFFIDAVIT OF THE DIRECTOR OF A PRIVATE LABORATORY.

### THE RESULTS ARE ALSO NOT ADMISSIBLE UNDER I.R.E. 803(24), IN THE ABSENCE OF FINDINGS SATISFYING THE REQUIREMENTS OF THE RULE.

Horsley asserts that the report of the results of the DNA–PRINT analysis attached to the affidavit of the director of the clinical laboratories of Lifecodes was not admissible in the preliminary hearing. We agree.

Horsley objected to the admission of the report under I.C.R. 5.1(b). This rule relates to the probable cause finding at a preliminary hearing. With regard to the receipt of hearsay at the preliminary hearing, it states:

The finding of probable cause shall be based upon substantial evidence upon every material element of the offense charged; provided that hearsay in the form of testimony, or *affidavits*, may be

admitted to show the existence or nonexistence of business or *medical facts and records*, judgments and conviction of courts, ownership of real or personal property and *reports of scientific examinations of evidence by state or federal agencies or officials*, provided the magistrate determines the source of said evidence to be credible. Provided, nothing in this rule shall prevent the admission of evidence under *any recognized exception to the hearsay rule* of evidence.

(Emphasis added.)

In upholding the decision of the magistrate to admit the report, the district judge premised his decision on the conclusion that the report (1) showed the existence or nonexistence of medical facts and (2) was admissible as an exception to the hearsay rule under I.R.E. 803(24). We hold that the report was admissible on neither of these grounds.

■ I.C.R. 5.1(b) distinguishes between hearsay in the form of affidavits showing the existence or nonexistence of medical facts and records and reports of scientific examinations of evidence by state or federal agencies or officials. The Lifecodes report was a report of a scientific examination of evidence, not a report showing the existence or nonexistence of medical facts.

"Medical" is defined as: "Pertaining, relating or belonging to the study and practice of medicine, or the science and art of the investigation, prevention, cure, and alleviation of disease." BLACK'S LAW DICTIONARY 885 (5th ed. 1979). The "practice of medicine" is defined in our statutes as meaning:

(a) To investigate, diagnose, treat, correct, or prescribe for any human disease, ailment, injury, infirmity, deformity, or other condition, physical or mental, by any means or instrumentality, or

(b) To apply principles or techniques of medical science in the prevention of any of the conditions listed in subsection (a) of this section, or

(c) To offer, undertake, attempt to do or hold oneself out as able to do any of the acts described in subsections (a) and (b) of this section.

I.C. § 54–1803(1) (1988).

The report at issue here did not purport to relate to the investigation, diagnosis, treatment, correction or prescription for any disease, ailment, injury, infirmity, deformity or other condition, physical or mental. Rather, it compared the genetic identity of the blood of Horsley and the victim with that of the victim's vaginal secretions containing sperm from the perpetrator of the rape. The director of the Lifecodes laboratory who signed the affidavit to which the report was attached did not purport to be a medical doctor. The report concerned the results of scientific examinations and not medical facts or reports. While we acknowledge that some scientific examinations concern medical facts, this exhibit did not. Therefore, the report was not admissible, unless it was admissible under I.R.E. 803(24).

■ I.R.E. 803(24) follows twenty-two exceptions to the hearsay rule listed in I.R.E. 803(1) through (22). (I.R.E. 803(23) is "Reserved.") These other exceptions are clearly recognized exceptions to the hearsay rule as referred to in I.C.R. 5.1(b). In *State v. Hester*, 114 Idaho 688, 760 P.2d 27 (1988), and *State v. Giles*, 115 Idaho 984, 772 P.2d 191 (1989), we upheld the admission of evidence under I.R.E. 803(24). In *Hester* we noted that the comments to I.R.E. 803(24) of the Idaho State Bar Evidence Committee explained that this "other exception" subsection of the rule recognizes that not every contingency can be treated by detailed rules and that the hearsay rule has never been a closed system and should not be. 114 Idaho at 696, 760 P.2d at 35.

In *Hester* we said:

To be admissible under I.R.E. 803(24), the court must determine that (A) the statement has circumstantial guarantees of trustworthiness equivalent to those in Rules 803(1) to 803(23), (B) the statement is offered as evidence of a material fact, (C) the statement is more probative on the point for which it is offered than any other evidence which the proponent can

procure through reasonable efforts, and (D) the general purposes of the rules of evidence, and the interests of justice, will best be served by admission of the statement into evidence. Further, (E) a statement may not be admitted under I.R.E. 803(24) unless its proponent gives the adverse party adequate notice and information regarding use of the statement. Once these elements are met, the I.R.E. 803(24) exception is equally as valid as any other hearsay exception, such as the universally accepted present sense impression and the excited utterance exceptions, etc.

114 Idaho at 697, 760 P.2d at 36.

In upholding the admission of hearsay under I.R.E. 803(24) in *Hester*, we carefully reviewed the specific findings of the trial court as to each of these five requirements of the rule. In *Giles* we also upheld the admission of hearsay under I.R.E. 803(24). In doing so we noted:

All of the I.R.E. 803(24) requirements were addressed by the trial court in determining the admissibility of the hearsay evidence. The trial court evaluated the hearsay statements for relevancy, need and reliability.... The analysis required by I.R.E. 803(24) and *Hester* contemplates that the trial court will look at all the other evidence to determine whether it tends to corroborate the hearsay statement, before the trial court concludes that the hearsay statement has the same circumstantial guarantees of trustworthiness equivalent to the other hearsay exceptions.

115 Idaho at 987, 772 P.2d at 194.

The difficulty in applying I.R.E. 803(24) to the admission of the Lifecodes report in this case is that the magistrate did not purport to admit the report under the rule and, therefore, did not address the five requirements that must be met to make the exception equally as valid as any other hearsay exception. The district judge did not evaluate the admissibility of the report under the rule by specifically finding that the five requirements stated in the rule were satisfied. After ruling that the report was admissible as showing the existence or nonexistence of medical facts, the district judge said: "I would just comment that with respect to the exception 803(24), I think this is admissible under that section, also." The only one of the five requirements of the rule addressed by the district judge was the adequacy of notice requirement.

■ While we are prepared to defer to the discretion of the trial courts in the admission of evidence, we are not prepared to endorse the exercise of discretion to admit evidence under I.R.E. 803(24) unless the trial court makes specific findings that each of the five requirements of the rule have been satisfied. Otherwise, we will not be able to determine whether the trial court considered all of the requirements that must be met before evidence is admitted under I.R.E. 803(24) and properly exercised its discretion in admitting the evidence.

It is clear from the transcript of the preliminary hearing that the magistrate would not have concluded that there was probable cause, if the Lifecodes report had not been admitted. At the conclusion of the hearing the magistrate said:

The only issue here is if there is Probable Cause to believe that the defendant, Mr. Horsley is the one that committed the rape. His activities on the evening in question are not inconsistent with his having been the perpetrator of this offense. Paying particular attention to page three of Plaintiff's Exhibit #3 I would note that indicates that the DNA pattern seen in the vaginal secretions matched the pattern from Todd Horsley. This pattern would occur in the population in one sample out of twelve million six hundred seventy-eight thousand six hundred sixty-seven (12,678,667). In view of the totality of the evidence I would find that there is reason to believe or Probable Cause to believe that Mr. Horsley is the perpetrator of this rape.

■ We have failed to overturn convictions for defects of proof in the preliminary hearing when at a fair trial the accused was found guilty upon sufficient evidence to sustain the verdict. *State v. Streeper,*

113 Idaho 662, 664–65, 747 P.2d 71, 73–74 (1987); *State v. Mitchell,* 104 Idaho 493, 660 P.2d 1336, *cert. denied,* 461 U.S. 934, 103 S.Ct. 2101, 77 L.Ed.2d 308 (1983). However, Horsley entered a conditional plea specifically reserving the right to appeal the admission of the Lifecodes report. Since neither the magistrate nor the district judge made the necessary findings for the admission of the report under I.R.E. 803(24), we have no alternative but to reverse the decision of the district judge denying the motion to dismiss the information.

AS TO PART V:

BISTLINE, JOHNSON, and McDEVITT, JJ., concur.

BAKES, C.J., and BOYLE, J., dissent.

VI.

CONCLUSION.

The judgment of conviction and sentence are reversed.

BAKES, Chief Justice, concurring in part and dissenting in part:

I concur fully in Parts I, III and IV of the Court's opinion. Regarding Part II, there is substantial authority to support an argument that the trial court's minute entry order entered on December 14, 1987, was itself sufficient to dismiss the action. *See, e.g., Fisher v. Eckert,* 94 Cal.App.2d 890, 212 P.2d 64, 67 (1949) ("Entry in minutes of a dismissal by the court constitutes entry of the judgment."); *Stockwell v. State,* 98 Idaho 797, 573 P.2d 116 (1977); *State v. Collins,* 112 Wash.2d 303, 771 P.2d 350 (1989); *E.J. Smith Construction Co. v. Burton,* 262 Md. 62, 277 A.2d 84 (1971); *Baty v. City of West Des Moines,* 259 Iowa 1017, 147 N.W.2d 204 (1966); *Jones v. Busby,* 37 Okl.Cr. 68, 256 P. 758 (1927); 27 C.J.S. Dismissal & Nonsuit § 72 (1959 and updates). Nevertheless, as the Court's opinion in Part III correctly points out, the trial court's April 21, 1988, order which dismissed the first action *"nunc pro tunc* to December 14, 1987," effectively terminated the action as of December 14, 1987.

Accordingly, I concur with the conclusion reached by the majority that the first information was dismissed as of December 14, 1987.

Regarding Part V, I disagree with the majority's conclusion that the DNA–PRINT test results were inadmissible evidence for purposes of determining probable cause under I.C.R. 5.1(b) because they were not "medical facts." Also, I disagree with the majority's conclusion that "[s]ince neither the magistrate nor the district judge made the necessary findings for the admission of the [DNA–PRINT] report under I.R.E. 803(24), we have no alternative but to reverse the decision of the district judge denying the motion to dismiss the information." At 929, 792 P.2d at 954.

On appeal Horsley argues that the district court erroneously affirmed the magistrate's decision to admit at the probable cause hearing State's Exhibit 3 (the affidavit of Dr. Ivan Balazs, Ph.D., Lifecodes' Clinical Laboratory Director, with the attached DNA–PRINT test results). Horsley contends that these documents are hearsay and inadmissible under both I.C.R. 5.1(b) and I.R.E. 803(24). Specifically, concerning I.C.R. 5.1(b), Horsley contends that: (1) Dr. Balazs' affidavit was not in proper form; and (2) the DNA–PRINT test results were not "medical facts," but rather "scientific examination," and that only affidavits of federal agencies or officials, not private entities or persons, are admissible to prove the results of "scientific examinations." It is upon the second ground that the majority reverses the district court's ruling that State's Exhibit 3 was admissible under I.C.R. 5.1(b) at the probable cause hearing.

As to the first contention that the affidavit was not in proper form, the affidavit states:

I, Ivan Balazs, *being first duly sworn on oath,* deposes and says that I authored the report (FB 03248) and oversaw the conduct of the scientific analysis therein, in the ordinary course and scope of my duties for Lifecodes Corporation. The conclusions reflected in the report are true and accurate to the best of my knowledge.

(Emphasis added.) Balazs signed the foregoing sworn statement before a notary public in the State of New York. Appellant has made no showing, nor supplied any authority, which would indicate that the affidavit was inadequate by the laws of the State of New York where it was executed. Error will not be presumed on appeal. *Gaither v. EG & G Idaho,* 106 Idaho 675, 676, 682 P.2d 628, 629 (1984) ("It is axiomatic that we will not presume error on appeal, but that error must be shown affirmatively by appellant on the record."). *See, Loomis, Inc. v. Cudahy,* 104 Idaho 106, 656 P.2d 1359 (1982); *Payette Farms Co. v. Conter,* 103 Idaho 148, 645 P.2d 888 (1982); *Woods v. Crouse,* 101 Idaho 764, 620 P.2d 798 (1980); *Rutter v. McLaughlin,* 101 Idaho 292, 612 P.2d 135 (1980). Appellant has made no showing of error, and accordingly, this part of appellant's claim should be rejected.

Horsley's second ground, and the ground upon which the majority reverses the district court, is that I.C.R. 5.1(b), while permitting hearsay in the form of testimony or affidavits to show the existence of medical facts and records, limits the admission of hearsay reports of scientific examinations to reports of state or federal agencies or officials.[1] Horsley argues that the affidavit of Dr. Balazs refers to scientific examination facts, rather than medical facts, and as a result only the affidavits of governmental agencies or officials, not private entities or individuals such as Dr. Balazs, were admissible under I.C.R. 5.1. Horsley's argument requires this Court to interpret I.C.R. 5.1(b) for the first time and to define and distinguish between medical facts and scientific facts. I disagree with the majority's conclusion that the Lifecodes report of DNA–PRINT test results "was a report of a scientific examination of evidence, not a report showing the existence

or nonexistence of medical facts." At 927, 792 P.2d at 952.

Webster's Third New International Dictionary lists one of the definitions of "medicine" as "the *science* and art of dealing with the maintenance of health and the prevention, alleviation, or cure of disease." (Emphasis added.) Black's Law Dictionary (5th ed.) also defines "medical" as pertaining to the "*science* and art of investigation, prevention, cure, and alleviation of disease." (Emphasis added.) It thus appears that medicine is a science as well as an art, and thus medical facts are a subset of the general category of scientific facts. Medical investigations and examinations are a specialized segment of the larger category of all scientific investigation or examinations. I.C.R. 5.1(b) does not disclose why only affidavits of scientific examinations conducted by governmental entities are admitted, while affidavits regarding medical facts are not limited to governmental entities or individuals, but include private entities and individuals. One possible explanation could be that I.C.R. 5.1(b) reflects the reality that most medical examinations and testing take place in the private sector and that the quality of that testing and examinations appear to be uniformly high, giving it a presumption of reliability. Whatever may be the reason, I.C.R. 5.1(b) provides that hearsay in the form of affidavits of private individuals or entities of medical facts and records is admissible. Even though such medical facts may be derived from scientific examinations, they are nevertheless expressly admissible by affidavit under I.C.R. 5.1(b).

The issue then becomes whether the committing magistrate abused his discretion in concluding that the DNA–PRINT test results and report attached to the affidavit of Dr. Balazs contained evidence of medical

---

1. I.C.R. 5.1 reads in relevant part:
   **Rule 5.1. Preliminary hearing—Probable cause hearing—Discharge or commitment of defendant—Procedure.—** ....
   (b) ... The finding of probable cause shall be based upon substantial evidence upon every material element of the offense charged: provided that hearsay in the form of testimony, or affidavits, may be admitted to show the existence or nonexistence of business or medical facts and records, judgments and convictions of courts, ownership of real or personal property and reports of scientific examinations of evidence by state or federal agencies or officials, provided the magistrate determines the source of said evidence to be credible.
   ....

facts and records so as to be admissible under I.C.R. 5.1(b). *Soria v. Sierra Pacific Airlines, Inc.*, 111 Idaho 594, 606, 726 P.2d 706, 718 (1986) ("Idaho grants trial judges 'broad discretion as to the admission of evidence and the exercise of that discretion will not be overturned absent a clear showing of abuse.' *Cheney v. Palos Verdes Investment Corp.*, 104 Idaho 897, 900, 665 P.2d 661, 664 (1983)."). This discretion given to the magistrate stems from the fact that the magistrate need only find probable cause, and that if the defendant is bound over for trial, the State must then prove its case at trial beyond a reasonable doubt. Even if the magistrate is found to have erred, this Court in *State v. Mitchell*, 104 Idaho 493, 660 P.2d 1336 (1983), stated, "Even if the magistrate erred in relying on evidence at the preliminary hearing that is ultimately determined to be inadmissible, the error is not a ground for vacating a conviction where the appellant received a fair trial and was convicted, and there is sufficient evidence to sustain the conviction." *See also, State v. Maylett*, 108 Idaho 671, 701 P.2d 291 (Ct.App.1985); *State v. Streeper*, 113 Idaho 662, 747 P.2d 71 (1987). Although the defendant Horsley pleaded guilty, rather than being found guilty by a jury, a guilty plea admits the truth of all of the truth of all of the facts alleged in the information, even though the defendant maintains his innocence, as the defendant has done in this case. *State v. Coffin*, 104 Idaho 543, 661 P.2d 328 (1983) (a valid guilty plea, voluntarily and understandingly given, is a judicial admission of all facts charged by the indictment or information even though the defendant is maintaining his innocence); *State v. Tipton*, 99 Idaho 670, 587 P.2d 305 (1978); *Still v. State*, 97 Idaho 375, 544 P.2d 1145 (1976); *State v. Jackson*, 96 Idaho 584, 532 P.2d 926 (1975); *Lockard v. State*, 92 Idaho 813, 451 P.2d 1014 (1969); *Clark v. State*, 92 Idaho 827, 452 P.2d 54 (1969).

Accordingly, I believe that the magistrate did not abuse his discretion in concluding that the DNA–PRINT test results contained in the affidavit of Dr. Balazs referred to "medical facts" within I.C.R. 5.1(b), and thus the magistrate did not err in admitting the affidavit of Dr. Balazs. The DNA–PRINT test results were facts concerning the genetic pattern from the DNA in body fluids from the defendant Horsley. Those fluids were from a sample of blood which he had voluntarily given to the police, and the semen taken from the vagina of the rape victim immediately after the rape. The genetic pattern of the DNA molecule in Horsley's blood matched the genetic pattern of the semen taken from the rape victim immediately after the rape. As the affidavit of Dr. Balazs points out, the possibility of two Caucasian persons having the same DNA pattern is one out of billions.[2] I believe that examinations of the human body, including scientific testing of the tissue and fluids, are sufficiently related to medical science that the magistrate did not abuse his discretion in concluding that the affidavit of Dr. Balazs referred to "medical facts" within the meaning of I.C.R. 5.1(b). Accordingly, we should rule that the magistrate did not err in admitting State's Exhibit 3 at the probable cause hearing.

Because State's Exhibit 3 should be admissible under I.C.R. 5.1(b) it is not necessary to determine whether the exhibit is also admissible under I.R.E. 803(24). However, the majority concludes that the exhibit is inadmissible not only under I.C.R. 5.1(b) but also because neither lower court made a specific finding that the exhibit was also admissible under I.R.E. 803(24). The

---

2. Genetic identification is a modern and highly precise identification method increasingly accepted by courts. *See, e.g., United States v. Kandiel*, 865 F.2d 967 (8th Cir.1989); *Spencer v. Commonwealth*, 238 Va. 275, 384 S.E.2d 775 (1989); *Cobey v. State*, 73 Md.App. 233, 533 A.2d 944 (1987); *cf. People v. Castro*, 45 Cr.L. 2375 (N.Y.Sup.Ct., Bronx Cty., 1989). Likewise, statistical probabilities, such as Dr. Balazs' mathematical conclusion, as contained in an addendum to his original report, that the DNA pattern in Horsley's blood sample matched the DNA pattern in the vaginal secretions, a pattern which would occur in a Caucasian population in 1:33,560,433,190 are admissible. *United States v. Kandiel*, 865 F.2d 967 (8th Cir.1989); *United States v. Gwaltney*, 790 F.2d 1378 (9th Cir.1986), *cert. denied* 479 U.S. 1104, 107 S.Ct. 1337, 94 L.Ed.2d 187 (1987).

majority quotes *State v. Hester*, 114 Idaho 688, 760 P.2d 27 (1988), for the proposition that for evidence to be admissible under I.R.E. 803(24) the court must determine whether five requirements are met. The five requirements are specifically contained in I.R.E. 803(24).[3] While the majority correctly notes that the magistrate did not consider admissibility under I.R.E. 803(24) and the district court did not make specific findings as to each of the five requirements of I.R.E. 803(24), I do not agree with its conclusion that we therefore "have no other alternative but to reverse the decision of the district judge denying the motion to dismiss the information." At 929, 792 P.2d at 954. One alternative to reversal would be to conduct such an analysis here on appeal. However, a better course would be to remand to the magistrate court with instructions for it to make a full and specific analysis as to whether State's Exhibit 3 meets the five requirements under I.R.E. 803(24). *See, e.g., Pope v. Intermountain Gas Co.*, 103 Idaho 217, 225, 646 P.2d 988, 996 (1982) ("The absence of findings and conclusions may be disregarded by the appellate court *only* where the record is clear, and yields as obvious answer to the relevant question.... Absent such circumstances, the failure of the trial court to make findings of fact and conclusions of law concerning the material issues ... will necessitate a reversal of the judgment and a remand for additional findings and conclusions, unless such findings and conclusions would not affect the judgment entered.")

BISTLINE, Justice, concurring in part and dissenting in part.

I concur in Part V of Justice Johnson's opinion, in which he questions the admissi-

bility at the preliminary hearing of the results of a DNA–PRINT test conducted by Lifecodes, a private laboratory. I also concur with Part II of the majority opinion, in which Justice Johnson writes for the majority that the minute entry was insufficient to dismiss the first prosecution. The minute entry included no statement of the reason for the dismissal, as required by I.C.R. 48. However, I disagree with Parts III and IV of the majority opinion, and the determination that Horsley's statutory speedy trial right has not been violated. The majority quickly sidesteps this issue by holding that the nunc pro tunc order entered to dismiss the first prosecution against Horsley was effective. As I explain below, the majority's analysis of the speedy trial issue impermissibly shifts the burden of proof onto Horsley to show prejudice, when Horsley had already established a prima facie violation of his statutory speedy trial right. Case law clearly indicates that the establishment of a prima facie violation of a defendant's statutory speedy trial right shifts the burden onto the State to show good cause for the delay. No showing of prejudice to the defendant because of the State's delay is required.

Part I of my opinion discusses the use of DNA tests in criminal proceedings. Part II discusses the application in this case of the phrase "nunc pro tunc," as well as the new requirement announced by the majority opinion that a defendant must now show prejudice to have the right to a speedy trial under I.C. § 19–3501 enforced.

## I. THE ADMISSIBILITY OF DNA TEST RESULTS

I endorse the statement made by Justice McDevitt in his special concurrence that a

---

3. I.R.E. 803(24) reads in relevant part:

**Rule 803. Hearsay exceptions; availability of declarant immaterial.**—The following are not excluded by the hearsay rule, even though the declarant is available as a witness.... (24) Other exceptions. [1] A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that [2](A) the statement is offered as evidence of a material fact; [3](B) the statement is more probative on the point for which it is offered than any other evidence

which the proponent can procure through reasonable efforts; and [4](C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. [5] A statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

"test is only as good as the procedures used." There is a real possibility that test procedures and protocols used by private laboratories to evaluate criminal evidence may be sloppy. While Chief Justice Bakes asserts in his separate opinion that "[g]enetic identification is a modern and highly precise identification method increasingly accepted by courts," I would caution. that any movement by state courts toward unquestioned acceptance of DNA test results appears to have stalled. DNA tests, when performed incorrectly or without care, are coming under attack by both experts and state courts as more prejudicial than probative of a perpetrator's identity. Criticism of DNA testing procedures is sufficiently strong that judges at the trial stage *and* preliminary hearing stage should be wary of test results.

When private labs such as Lifecodes perform DNA identification tests, criticism of the testing procedures of these labs often leads to the inadmissibility of the test results. *See* for example, Anderson, *DNA Evidence Questioned*, A.B.A.J. 18 (October 1989); *People v. Castro*, 144 Misc.2d 956, 545 N.Y.S.2d 985, 999 (N.Y.Sup.Ct.1989) ("[t]he testing laboratory [Lifecodes] failed in several major respects to use the generally accepted scientific techniques and experiments for obtaining reliable results, within a reasonable degree of scientific certainty"); *State v. Schwartz*, 447 N.W.2d 422, 428 (Minn.1989) ("we hold that admissibility of specific test results in a particular case hinges on the laboratory's compliance with appropriate standards and controls, and the availability [to the court and the parties] of their testing data and results .... the laboratory [Cellmark] in this case did not comport with these guidelines, the test results lack foundational adequacy and, without more, are thus inadmissible") (footnotes omitted); Thompson and Ford, *DNA Typing: Acceptance and Weight of the New Genetic Identification Tests*, 75 Va.L.Rev. 45,104 (1989) ("certainly under several scenarios, the Lifecodes test might produce a false positive. Whether Lifecodes' laboratory procedures are adequate to detect these problems is difficult to assess at this point, because the compa-

ny has chosen not to make its laboratory protocol and manual available for public scrutiny") (footnote omitted); Note, *DNA Printing: The Unexamined "Witness" in Criminal Trials*, 77 Cal.L.Rev. 665 (1989) (questioning the relevancy and *Frye* standards of admissibility for new scientific evidence, and recommending legislation as the answer to ensure test reliability, fairness to defendants, quality controls, and to minimize encroachments on privacy).

The most comprehensive response to the problem of determining the reliability of DNA testing procedures by the courts is found in *People v. Castro*, 144 Misc.2d 956, 545 N.Y.S.2d 985 (N.Y.Sup.Ct.1989). In *Castro*, the court first discussed in comprehensive but understandable detail the tests usually performed to examine DNA, then outlined what pre-trial discovery should reveal about the test procedures before the test results are admissible at trial:

> The proponent [of the test results], whether defense or prosecution, must give discovery to the adversary, which must include: 1) Copies of autorads, with the opportunity to examine the originals. 2) Copies of laboratory books. 3) Copies of quality control tests run on material utilized. 4) Copies of reports by the testing laboratory issued to proponent. 5) A written report by the testing laboratory setting forth the method used to declare a match or a non-match, with actual size measurements, and mean or average size measurement, if applicable, together with standard deviation used. 6) A statement by the testing lab, setting forth the method used to calculate the allele frequency in the relevant population. 7) A copy of the data pool for each loci examined. 8) A certification by the testing lab that the same rule used to declare a match was used to determine the allele frequency in the population. 9) A statement setting forth observed contaminants, the reasons therefore, and tests performed to determine the origin and results thereof. 10) If the sample is degraded, a statement setting forth the tests performed and the results thereof. 11) A statement setting forth any other

observed defects or laboratory errors, the reasons therefore and the results thereof. 12) Chain of custody documents.

*Castro*, 545 N.Y.S.2d at 999. These twelve discoverable and highly useful pieces of information must be available to the court and the parties in order for test procedures to be verified as accurate.

The burden of proof on these matters of accuracy and reliability, as the *Castro* opinion points out, is clear. *Id.* There is no presumption enjoyed by the proponent of the test results that the test procedures were performed with care. The proponent must come forward and establish that the tests were properly conducted by the testing laboratory. If the proponent successfully comes forward with information that establishes the reliability of the data offered, then the opponent may by a preponderance of the evidence show that the tests or the calculations performed to determine the test results should be suppressed, or perhaps modified. However, if the proponent cannot or does not establish the foundation for the tests and the test results, the court should consider the test results inadmissible for all purposes. No court should be fooled into lending credibility to what only facially appears to be a scientifically determined test result.

## II. THE STATUTORY SPEEDY TRIAL RIGHT

To frame this issue, included herein is a brief review of the procedural history of this case. The first information was filed August 26, 1987, and trial was set for December 15. On December 14, *one day* before trial, the prosecutor moved via telephonic conference for a continuance. This motion was denied, but the judge then suggested to the prosecution that the prosecution request dismissal without prejudice. Dismissal was granted. The judge stated he was granting the prosecution's dismissal request pursuant to I.C.R. 48. That rule affirmatively requires that the court "shall state in the order of dismissal its reasons for such dismissal." The judge requested the prosecution to draw up an order of dismissal. A written dismissal order was finally prepared April 21, 1988, approximately *four months later.* The judge signed it and wrote in hand upon the order that it was "nunc pro tunc December 14, 1987." Before this nunc pro tunc order was signed, another criminal complaint for the identical charge was filed against Horsley on January 4, 1988.

The majority today endorses the use of nunc pro tunc orders of dismissal in criminal cases, and thereby avoids confronting the requirements of Idaho's statutory speedy trial provisions. There are (at least) three problems with the majority's analysis that prevent me from concurring in this portion of the opinion of the Court. First, the State's showing of good cause for not bringing the defendant to trial within six months was not sufficient. Second, the majority's reliance upon a dismissal order nunc pro tunc, filed months after the first prosecution was to be dismissed, makes a mockery of the clear intent of I.C. § 19–3501. Third, the majority improperly, unfairly, and without justification shifts the burden to the defendant, forcing Horsley to show that he was somehow prejudiced by the delay. This burden is neither required by the statute, nor mandated by a reasonable interpretation of the case law that discusses I.C. § 19–3501. Each of these three problems will be addressed in turn.

### A. The State's Showing of Good Cause

The statutory right to a speedy trial provided by this State is contained in two provisions of the Idaho Code. I.C. § 19–106 states the speedy trial right, and I.C. § 19–3501 is the enforcement mechanism for that right. Both of these statutes should be considered whenever I.C.R. 48 is invoked. Although the majority opinion is silent on this point, it is obvious that the trial judge suggested dismissal without prejudice, and initially denied the prosecution's motion for a continuance, precisely because of I.C. § 19–106.

In my opinion, this maneuver is never justified for misdemeanors (*see* I.C. § 19–3506), nor is it justified in the case of

a felony simply by satisfying the requirements of I.C.R. 48. The appropriate standard that must be satisfied (before a delay of commencing trial beyond the statutory six month period is justified) is provided by the enforcement mechanism for the affected entitlement, *i.e.*, I.C. § 19-3501. Good cause for the delay must be shown. *See State v. Gabrielson*, 109 Idaho 507, 509, 708 P.2d 912, 914 (Ct.App.1985). It is not sufficient, as I.C.R. 48 states, to simply show that "dismissal will serve the ends of justice and the effective administration of the court's business."

As the Court of Appeals has recently stated:

> Under I.C. § 19-3501, a court must dismiss an action when a defendant is not brought to trial within six months from the date that the indictment or information is filed, "unless good cause to the contrary is shown." The burden is on the state to show good cause for the delay. *State v. Hobson*, 99 Idaho 200, 579 P.2d 697 (1978). If there is no good cause for the delay, or if the trial was not postponed at the defendant's request, then the charge against the accused must be dismissed and the inquiry is at an end. *State v. Dillard*, 110 Idaho 834, 718 P.2d 1272 (Ct.App.1986), *cert. denied*, 479 U.S. 887, 107 S.Ct. 283, 93 L.Ed.2d 258 (1986).

> Good cause means a substantial reason; one that affords a legal excuse. [Citations omitted.] There is no fixed rule for determining good cause for delay of trial; the matter—initially at least—is left to the discretion of the trial court. [Citations omitted.] Because there is no hard and fast rule for determining "good cause," the ultimate question of whether legal excuse has been shown is a matter for judicial determination upon the facts and circumstances of each case. However, this does not mean that trial judges have unbridled discretion to find "good cause." We will independently review the lower court's decision. Such independent review is justified where highly important rights, like speedy trial, are at issue.

*State v. Stuart*, 113 Idaho 494, 495–96, 745 P.2d 1115, 1116–17 (Ct.App.1987). Was good cause shown by the prosecution when it requested a delay in the commencement of Horsley's trial?

The prosecutor stated that it would have been a waste of taxpayers' money to have the Lifecodes experts flown in from New York if the trial was going to be delayed and, as a result, he had not finally arranged for their attendance. He stated that he wanted to have any defense motion to continue the trial decided before he went to the expense of bringing the experts in. It was then after 9:00 p.m., on December 10, 1987. Judge Michaud asked, "Are there any further motions to come before the court at this time?" Defense counsel responded, "No motion for a continuance, Your Honor." With no other business at hand, Judge Michaud recessed court, indicating that the trial would commence as scheduled on December 15, 1987.

Four days later the prosecution requested a continuance. The good cause the prosecution provided was that the two experts from Lifecodes, the private DNA testing lab, were no longer available for trial. No indication from the record is given regarding what occurred in the four days from the time both counsel for the defense and counsel for the prosecution were put on notice that the trial would in fact go forward, and the day the prosecution requested a continuance. To show good cause, it simply is not enough that a prosecutor orally declare that his witnesses are unavailable. Rather it is required that a full and reasonable explanation be provided.

A full and reasonable explanation has assiduously been required by this Court in the past. For example, in *State v. Goodmiller*, 86 Idaho 233, 236, 386 P.2d 365, 366 (1963), the prosecution's motion for dismissal explained why the unavailable witness was a material witness for the prosecution (he was an accomplice to the defendant) and why he was unavailable to testify at trial (he was in prison in another state). In *State v. Hopple*, 83 Idaho 55, 357 P.2d 656 (1960), a supporting affidavit submitted by

the prosecution with its request for a continuance specifically discussed why the unavailable witness was material and unavailable:

The affidavit of the senior deputy prosecuting attorney states that the sheriff James Benham ... had suddenly been stricken ill with a serious kidney ailment and is confined in a local hospital; that affiant has been advised by two physicians that said witness will be incapacitated for an indeterminate number of days; that said witness would have testified as to specific exhibits, identifying them and connecting them with the defendant; to conversations had with the defendant; the identification of the sheep which are the subject of the grand larceny charge and to conversations with five other material witnesses.

*Hopple*, 83 Idaho at 58, 357 P.2d at 658. In contrast to *Hopple* and *Goodmiller*, the prosecutor in this case offered practically no explanation for his inability to proceed to trial on the pre-determined date. The prosecutor provided no explanation of his efforts to provide for different experts, instead of the Lifecodes experts that are stationed in New York. If protecting the taxpayers' money was the real reason for not having the experts in town for trial, why weren't experts from nearby universities and other research centers requested to attend the trial?

*Hopple* and *Goodmiller* demonstrate that a showing of good cause is a relatively easy hurdle for the prosecution to clear. This easy hurdle has been knocked asunder by today's majority holding. Instead of placing *stare decisis* reliance on *Hopple* and *Goodmiller*, the majority replaces the statutory requirement of showing good cause with a simple assertion by the prosecution of good cause. This Court has provided no reason for changing and thereby gutting the requirement of a showing of good cause, nor is it easy to divine a reason for the majority's dilution of the statutory speedy trial right.

## B. The Nunc Pro Tunc Order of Dismissal

A review of the use of the phrase "nunc pro tunc" in Idaho case law readily discloses that the majority's endorsement of a nunc pro tunc order of dismissal in this criminal case is a pronounced departure from previous genuine applications of nunc pro tunc orders. Allowing nunc pro tunc orders of dismissal to be effective in a criminal proceeding, when there is a statutory right to have the trial process commenced within a certain amount of time, destroys that statutory right. This can only result in wreaking havoc with legislative protections of the rights of the criminally accused in this State.

The majority's analysis is simple, and short enough to be repeated here:

Although neither party has addressed the issue, because we have concluded that the court minutes did not constitute an order dismissing the first information, we must consider whether the order issued by the trial court on April 21, 1988, dismissing the first case nunc pro tunc December 14, 1987, was effective.

. . . .

While this is a criminal case and *Ward* [*v. Lupinacci*, 111 Idaho 40, 720 P.2d 223 (Ct.App.1986)] and *Westmont* [*Tractor Co. v. Estate of Westfall*, 112 Idaho 712, 735 P.2d 1023 (1987)] were civil cases, we see no reason not to apply the same principles concerning nunc pro tunc judgments developed there to this set of circumstances. Applying these principles here, we hold that the order of April 21, 1988, dismissing the first case nunc pro tunc December 14, 1987, was effective as of the earlier date.

Majority opinion, at 925, 792 P.2d at 950. Responsive to that, my first wonder is as to the extent, if any, that the majority searched for a reason for applying the same principles concerning nunc pro tunc judgments developed in civil cases to this criminal case. In fact, as is explained below, this is the first case by a majority of this Court to discuss, let alone endorse, the use of nunc pro tunc orders in a criminal case. Without assistance or briefing from the parties, and without any consideration of the prejudicial effect on the statutory

right to a speedy trial, the majority endorses the use of nunc pro tunc orders to substantiate the dismissal of a prosecution *without prejudice*, so as to pave the way for the refiling of a new action, all for the better oppression of the defendant, and certainly not in consideration of the even-handed administration of justice. I cannot be so cavalier with the introduction of a predominantly civil concept into the criminal arena.

Of the thirty-two cases in Idaho that have used the phrase "nunc pro tunc," twenty-nine involve civil matters. None of the remaining three criminal cases support the proposition that nunc pro tunc orders are as acceptable in the criminal context as they are in the civil context. Of the three criminal cases in Idaho that use the phrase, not one discusses the ramifications of using nunc pro tunc orders in criminal proceedings. In *Housley v. State*, Idaho, 1989 WL 100586 (Ct.App. No. 17339, Sept. 1, 1989), a petition for post-conviction relief was dismissed, but the order of dismissal allowed the defendant to file another petition with an earlier effective date for the petition, *i.e.*, nunc pro tunc. This dismissal order was not challenged by the defendant, and the Court of Appeals opinion does not discuss the nunc pro tunc provision. In *State v. Hancock*, 111 Idaho 835, 727 P.2d 1263 (Ct.App.1986); *petition for review denied* 112 Idaho 950, 738 P.2d 420 (1987), the use of a nunc pro tunc order entered four months after imposition of sentence upon the defendant was not considered by a majority of this Court. Bistline, J. writing on the denial of petition for review, joined by Huntley, J., took considerable umbrage with the aberrational use of the nunc pro tunc order in *Hancock,* but elicited no activity whatever from Justices Shepard, Donaldson, and Bakes. *See* 112 Idaho at 950–53, 738 P.2d at 420–23. In *State v. Mee*, 102 Idaho 474, 632 P.2d 663 (1981), overruled by *State v. Elisondo*, 114 Idaho 412, 757 P.2d 675 (1988), this Court held that a much less grievous use of a nunc pro tunc order—certification by a magistrate of depositions—was an appropriate and enforceable action.

The majority opinion, without a pause to consider the use in prior opinions by this Court of the phrase, without the assistance of briefing by the parties, and without a request for additional briefing, gives grace and validity to the district judge's nunc pro tunc order of dismissal. This it does in obvious ignorance of the accepted translation, interpretation, and usage in Idaho of the phrase. The majority simply declares that without the order of dismissal, the first prosecution would have been viable. Yet, in a twist of reasoning only those members of the trial bar not overly concerned with the growth of prosecutorial power will easily accept, the majority pronounces that the defendant's speedy trial right was not violated because the nunc pro tunc order effectively ended the first prosecution before the running of the six months limitation provided for in the speedy trial statute!

In effect, the majority pays lip service only to the defendant's right to be brought to trial within six months, but the majority will not deign to recognize that right where the State attempts to undo what has already been done. What has already been done, and cannot be undone by an order nunc pro tunc, is obvious: In contravention of I.C. § 19–3501 the State has dangled a continuing prosecution over the defendant's head without bringing him to trial within the requisite six months. From this time forward, the six month time limit contained in I.C. § 19–3501 is meaningless. An order nunc pro tunc can turn back the clock for the prosecution at any time, on the whim of the prosecutor, as aided and abetted by this Court's holding.

C. I.C. § 19–3501 and Burdens of Proof

My final point highlights the most significant deviation from precedent in today's majority opinion. The majority has shifted the burden of proof away from the State (to *disprove* a speedy trial violation) and onto the shoulders of the defendant to *prove* something in addition to a prima facie violation of I.C. § 19–3501. Henceforth I.C. § 19–3501, the enforcement mechanism of the right to a speedy trial, will never be enforced unless the defendant

proves that some prejudice resulted from the delay. No longer is it enough, as previous cases have held (*see* for example *State v. Stuart*, 113 Idaho 494, 745 P.2d 1115 (Ct.App.1987)), for the defendant to show that the State has taken more than six months after the information was filed to bring on the trial. The prima facie violation, *i.e.*, not commencing trial within six months, is no longer recognized as a statutory speedy trial violation.

The majority explains the new burdens of proof, apparently without realizing that they have announced a new rule, in this way:

> In *Westmont* we noted that in *Ward* the Court of Appeals focused on the lack of unfair prejudice to the other parties in allowing the entry of judgment nunc pro tunc.
>
> . . . .
>
> The only evidence of prejudice that Horsley offered because of the delay in the dismissal of the first case was that his bond had not been exonerated. However, since his testimony was that he had furnished the bond through a bondsman for a premium of ten percent, we are unable to see what prejudice there was to Horsley.

Majority Opinion, at 925–926, 792 P.2d at 950–951. Idaho's statutory speedy trial right requires no showing of prejudice by the defendant. Moreover, the fact that the defendant has had the specter of the State over his head, with no resolution through a trial commenced within six months after an information was filed, is a sufficient showing of prejudice, if such a showing were required.

Why an order nunc pro tunc should be allowed to trump a statutory right in a criminal proceeding is beyond comprehension. In effect, the majority rewards the prosecution for its multiple transgressions, the first of which was in not bringing the defendant to trial within six months. At that point, all the defendant would have to establish in order for the Court to enforce the statutory speedy trial right was that six months had passed and a trial date, through no fault of the defendant, had not

been set. But the prosecution made another mistake—they forgot to ensure that the first prosecution had been properly dismissed. For their omission, the Court rewards them by placing a heavier burden on the defendant. Now, it is not enough for the defendant to show that six months had passed and no trial had begun. Horsley must also establish that he has been prejudiced (to the Supreme Court's satisfaction) by the fact that his speedy trial right was not honored.

In conclusion, I am reminded of the words of Oliver Wendell Holmes, Jr., when he wrote that:

> You cannot argue with your neighbor, except on the admission for the moment that he is as wise as you, although you may by no means believe it.

For the moment, although earnestly I have endeavored to understand the reasoning behind the majority's analysis and the majority's disposition of Horsley's statutory speedy trial claim, I am left without a wisp of insight, and see unfolding the demise of I.C. § 19–3501.

BOYLE, Justice, concurring and dissenting.

I fully concur in sections I, II, III and IV of the majority opinion, however I respectfully dissent to a portion of section V.

I agree with the majority in section V that the affidavit and report containing the DNA information is not admissible as a report of scientific examinations of evidence by state or federal agencies or officials. However, in my opinion the DNA information qualifies as "medical facts" and should be admissible by affidavit for the limited purpose of a probable cause finding at a preliminary hearing pursuant to I.C.R. 5.1(b).

McDEVITT, Justice, specially concurring.

I fully concur in the opinion so carefully crafted by Justice Johnson.

My only purpose in writing in this instance is to make it clear that this Justice at least, does not consider, nor does he interpret this opinion to hold, that DNA

analyses as contained in the Lifecodes Report are admissible absent a foundation as to the reliability of the testing procedures used by a particular laboratory making the test in question, including but not limited to, details of the quality control, validation protocol, formal methodology validation, independent replication and validation studies and findings from the foregoing as to the reliability of the procedures involved in the test in question. Absent such evidence the tests lack foundational adequacy. Any test is only as good as the procedures used.