977 P.2d 905

STATE of Idaho, Plaintiff–Respondent,

v.

Laura L. GILPIN, f/k/a Laura L. Pomerleau, Defendant–Appellant.

No. 24098.

Court of Appeals of Idaho.

April 2, 1999.

**644**

David H. Leroy, Boise, for appellant.

Hon. Alan G. Lance, Attorney General; Kenneth M. Robins, Deputy Attorney General, Boise, for respondent.

PERRY, Chief Judge.

Laura L. Gilpin, known as Laura L. Pomerleau at the time she was accused of committing this offense, appeals from a judgment of conviction for vehicular manslaughter, I.C. § 18–4006(3), entered upon her conditional guilty plea. Gilpin asserts that the district court erred when it denied her motion to suppress blood alcohol test results. We affirm.

## I.

### FACTS AND PROCEDURE

Gilpin was driving on a remote highway near Mountain Home, Idaho, with her two small children in the backseat of her utility vehicle. Her vehicle rolled over in a one-car accident, and Gilpin and her youngest child were ejected. As a result of the accident, Gilpin's youngest child died. Gilpin was life-flighted to Saint Alphonsus Regional Medical Center in Boise and was treated for a number of injuries, the most severe being injuries to her head. Upon her admittance to the emergency room, Gilpin was given a pseudo-identity, which assigned her the name "Unknown Fulton" and described her as a ninety-four-year-old male.[1] Gilpin was also assigned a patient identification number (PIN) 2030021 and a medical record number

(MRN) 00300880, which were on bands placed around each wrist.

Following standard protocol in treating a trauma patient, hospital personnel drew blood from Gilpin and sent it to the hospital laboratory for testing. The test results indicated that Unknown Fulton, with PIN 2030021 and MRN 00300880, had a blood alcohol level of .22.

Gilpin was charged with vehicular manslaughter and child endangerment. A preliminary hearing was held where witnesses, officers and hospital personnel testified. The magistrate found that there was probable cause to believe that Gilpin committed the crimes of vehicular manslaughter and child endangerment, and Gilpin was held to answer the charges before the district court.

Prior to trial, Gilpin filed a motion to suppress[2] (hereinafter designated as a motion in limine) the results of the blood test, claiming that the state would be unable to lay an adequate foundation for the admissibility of the test results and that the blood test results should not have been admitted at the preliminary hearing under I.C.R. 5.1 for the finding of probable cause to bind her over for trial. The district court reviewed the transcripts from the preliminary hearing and no further evidence was submitted. The district court denied Gilpin's motion, determining that Gilpin had failed to show that the prosecution would be unable to lay a sufficient foundation for the test results to be admitted into evidence at trial and also found that the results were properly admitted at the preliminary hearing under I.C.R. 5.1. The matter was then assigned to a different district judge for trial. Gilpin entered a conditional plea of guilty before that district judge, preserving the right to appeal from the denial of her motion in limine by the original district judge.

---

1. At the time, Gilpin was a twenty-five-year-old female.

2. What counsel refers to as a motion to suppress may be more properly denominated, in this case, a motion in limine. While no statute or rule expressly authorizes such a motion, this Court has recognized its existence and stated that it "enables a judge to rule on evidence without first exposing it to the jury.... The court's ruling on the motion enables counsel on both sides to make strategic decisions before trial concerning the content and order of evidence to be presented." *Davidson v. Beco Corporation,* 112 Idaho 560, 563, 733 P.2d 781, 784 (Ct.App.1986), *modified on other grounds,* 114 Idaho 107, 753 P.2d 1253 (1987).

## II.

### DISCUSSION

Although her position centers around the foundational requirements for the admissibility of the blood tests, Gilpin presents four distinguishable issues for our review, whether: (1) the magistrate erred by admitting the blood test results at the preliminary hearing pursuant to I.C.R. 5.1; (2) the district court misperceived the evidence, resulting in an erroneous factual finding which was unsupported by the evidence; (3) an adequate foundation can be laid for the admission of the blood test results at trial when the chain of custody cannot be established; and (4) Gilpin's right to procedural due process was violated when she showed that there were serious defects in the chain of custody. We will address each issue in turn.

### A. Admission of Blood Tests Before the Magistrate at the Preliminary Hearing

Gilpin claims that the magistrate erred at the preliminary hearing when it admitted, pursuant to I.C.R. 5.1, affidavits which contained Gilpin's medical records, including her blood alcohol content test results. According to Gilpin, a scientific examination of blood done by a private hospital as part of the medical treatment it provided to a patient is not admissible under Rule 5.1.

Idaho Criminal Rule 5.1 provides, in pertinent part:

(b) *Probable cause finding.* If from the evidence the magistrate determines that a public offense has been committed and that there is probable or sufficient cause to believe that the defendant committed such offense, the magistrate shall forthwith hold the defendant to answer in the district court. The finding of probable cause shall be based upon substantial evidence upon every material element of the offense charged; provided that hearsay in the form of testimony, or affidavits, may be admitted to show the existence or nonexistence of business or *medical facts and records,* judgments and convictions of courts, ownership of real or personal property *and reports of scientific examinations of evidence by state or federal agencies* or officials, provided the magistrate deter-

mines the source of said evidence to be credible.

(Emphasis added.).

Gilpin relies on *State v. Horsley,* 117 Idaho 920, 792 P.2d 945 (1990) to support her argument that Rule 5.1 requires that the tests be conducted by a state or federal governmental agency in order to be admitted as evidence at a preliminary hearing. Her reliance is misplaced. *Horsley,* in contradiction to Gilpin's argument, recognized the difference between *medical facts and records* and *reports of scientific examinations of evidence.*

I.C.R. 5.1(b) distinguishes between hearsay in the form of affidavits showing the existence or nonexistence of medical facts and records and reports of scientific examinations of evidence by state or federal agencies or officials. The [report in this case] was a report of a scientific examination of evidence, not a report showing the existence or nonexistence of medical facts.

*Horsley,* 117 Idaho at 927, 792 P.2d at 952. The Court went on to conclude that the report at issue was not admissible under I.C.R. 5.1, stating:

The report at issue here did not purport to relate to the investigation, *diagnosis, treatment,* correction or prescription *for any* disease, ailment, *injury,* infirmity, deformity or other condition, physical or mental. Rather, it compared the genetic identity of the blood of Horsley and the victim with that of the victim's vaginal secretions containing sperm from the perpetrator of the rape. The director of the Lifecodes laboratory who signed the affidavit to which the report was attached did not purport to be a medical doctor. The report concerned the results of scientific examination and not medical facts or reports.

*Horsley,* 117 Idaho at 927, 792 P.2d at 952 (emphasis added). Therefore, the Court concluded that the report was not admissible.

In Gilpin's case, the blood test was a part of her medical records created to aid in the diagnosis and treatment of her injuries. The affidavits containing Gilpin's medical records, including the blood alcohol content test results, were admissible pursuant to the

rationale behind Rule 5.1. *See Horsley,* 117 Idaho at 927, 792 P.2d at 952. Therefore, the magistrate did not err when it admitted the blood test results by affidavit at the preliminary hearing and properly considered them in its determination of probable cause.

## B. Admissibility of Blood Tests Before the District Court

### 1. Findings of fact

■ Appellate review of the sufficiency of the evidence is limited in scope. Factual findings will be upheld if they are supported by substantial, albeit conflicting, evidence in the record. *State v. Johnson,* 131 Idaho 808, 809, 964 P.2d 675, 676 (Ct.App.1998).

Gilpin contends that the designation that she was a male and ninety-four years of age was not randomly assigned to her but instead shows either that hospital personnel were confused about whom the blood samples belonged to or that the blood samples were tampered with. Gilpin claims that the district court misperceived the evidence and asserts that there was insufficient evidence to support the district court's finding that the blood samples were not tampered with and were not accidentally switched with another patient's blood samples. Thus, she claims the motion in limine would have been granted but for this error.

In reviewing the evidence, the district court described the identification process of a patient upon admission to the trauma center at the hospital.

If a patient was not positively identified upon arrival at the trauma center, or sometimes simply to save the time it would take to enter the correct information, the patient is assigned a unique, pseudo-identity. That identity includes a unique name (in this case "UNKNOWN, FULTON") and an age and sex (in this case 94 years old and male). Those pseudo-identities are created in advance so they can be used whenever desired. The pseudo-identity is simply to provide a unique identification and is not intended to be descriptive of the patient. The use of the pseudo-identity to identify the Defendant when she arrived at the trauma room is not a ground for excluding from evidence the results of her blood test.

Gilpin cites the preliminary hearing testimony of Dr. Livingston, the surgeon who treated Gilpin in the emergency room, in support of her claim that the district court's factual finding was error. In his testimony, Dr. Livingston stated that although the computer assigns a name, it does not randomly assign age or sex, but Dr. Livingston failed to explain further how age and sex are assigned. Dr. Livingston's testimony did not exclude the possibility that hospital personnel randomly assign age and sex.

■ At the preliminary hearing, the phlebotomist, who generally draws the blood, testified that Gilpin came in as an unidentified patient, that Unknown Fulton was her unique name that was established for purposes of identification, and that the identity was preassigned. The phlebotomist did not assert that the computer made the random assignment or that these characteristics were necessarily intended to describe the patient. Upon review, we conclude that the district court did not misperceive the evidence as Gilpin suggests and that Gilpin has failed to show that the blood samples were tampered with or were confused with another patient's on the basis of the pseudo-identity.

### 2. Motion in limine

■ A trial court's determination that evidence is supported by a proper foundation is reviewed for an abuse of discretion. *State v. Kodesh,* 122 Idaho 756, 757, 838 P.2d 885, 886 (Ct.App.1992).

Gilpin contends the district court erred when it concluded that results of the blood tests could be admitted into evidence at trial. Gilpin alleges there were numerous breaks in the chain of custody which she claims make the test results suspect. Therefore, she asserted, via pre-trial motion, that the state would not be able to lay a proper foundation at trial.

■ Idaho Rule of Evidence 901 controls the authentication of evidence and states:

(a) General provision. The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding

that the matter in question is what its proponent claims.

Often, the party offering evidence establishes the chain of custody in order to create a presumption that it was not materially altered during the chain of custody. *State v. Crook*, 98 Idaho 383, 384, 565 P.2d 576, 577 (1977); *Kodesh*, 122 Idaho at 757, 838 P.2d at 886. The burden then shifts to the defendant to overcome the presumption, and the defendant must make some showing that the evidence was tampered or meddled with. *Kodesh*, 122 Idaho at 757, 838 P.2d at 886; *State v. Ruybal*, 102 Idaho 885, 889, 643 P.2d 835, 839 (Ct.App.1982). The trial court must then determine that the proffered evidence has not been changed in any material respect. *Kodesh*, 122 Idaho at 757, 838 P.2d at 886; *State v. Campbell*, 104 Idaho 705, 715, 662 P.2d 1149, 1159 (Ct.App.1983). Proof of the chain of custody is a means by which identity of an exhibit may be established and by which the standard of admissibility can be satisfied; it is not, of itself, a separate requisite for admissibility. *Campbell*, 104 Idaho at 715, 662 P.2d at 1159.

There are several Idaho cases that discuss the chain of custody for blood samples. Generally, in laying a proper foundation for the admission of test results of a blood sample the practicalities of proof do not require the prosecution to negate all possibilities of substitution or tampering. *See State v. McFarland*, 88 Idaho 527, 401 P.2d 824 (1965); *State v. Coburn*, 82 Idaho 437, 354 P.2d 751 (1960); *State v. Webb*, 76 Idaho 162, 279 P.2d 634 (1955).

In *Webb*, testimony established who drew the blood, labeled it, took the blood to the laboratory and ran the tests. Testimony also revealed that the testing took more than thirteen hours to complete and during some of that time the blood was left unsupervised. The Court allowed the evidence, holding that there was nothing "in the evidence which would even create a suspicion the blood was molested during the analysis or that anyone who might be interested in tampering with it had access to the hospital laboratory." *Webb*, 76 Idaho at 168, 279 P.2d at 638.

In *Coburn*, evidence established that the doctor drew the blood and gave it to a nurse, who sealed it, marked it, and gave it to the sheriff.

The sheriff then took the samples to the L.D.S. Hospital at Logan, Utah, delivering them to a nurse who said she would put them into the refrigerator for the technician. The following morning, the witness Veibell took those blood samples labeled "Max Coburn" from the refrigerator and performed the required tests thereon.

*Coburn*, 82 Idaho at 447, 354 P.2d at 757. The Court determined:

> Although the testimony of the person receiving the blood samples at the hospital is absent from the record, nevertheless the circumstances sufficiently disclose the identification of the samples tested as being those drawn from appellant by Dr. Cutler. Nor is there any evidence which would cast the slightest inference that any irregularity occurred after the samples were delivered to the hospital by Sheriff Talbot. Therefore, such evidence was properly admitted.

*Coburn*, 82 Idaho at 447–48, 354 P.2d at 757.

We also find *Sullivan v. Municipality of Anchorage*, 577 P.2d 1070 (Alaska 1978) factually similar and, although based on the Alaska rule, regard its reasoning to be instructive. In *Sullivan*, evidence of a lab report indicated that the defendant had a blood alcohol level of .15, and he was convicted of driving while under the influence. In describing the chain of custody for the blood sample, one witness testified in detail about hospital procedure; standard operating procedures for drawing, marking and testing the blood specimens; what processes the blood goes through as it is tested; and how the results are recorded and filed. The laboratory supervisor also testified, identifying the lab report the prosecutor was trying to admit into evidence as being the standard form used in the laboratory. The laboratory supervisor testified that the lab report indicated who performed the tests.

The defendant, Sullivan, argued that the test results of the blood should not be admitted unless evidence was presented as to who actually withdrew the blood. Failure to do so, Sullivan asserted, created a fatal missing link in the chain of custody which rendered the test results suspect. The *Sullivan* court determined:

[The blood] test was ordered for medical reasons and it is reasonable to assume that hospital staff members are competent in the performance of their duties. Crucial life and death decisions are often made in hospitals on the basis of this presumption. We do not believe there is anything to gain by requiring a mechanistic parade of witnesses to ensure that the possibility of error or tampering is precluded beyond any doubt. Therefore, we hold that when a routine medical blood alcohol test is performed in a hospital, and the results are recorded in hospital files, Rule 44(a)(1) of the Alaska Rules of Civil Procedure supplies a presumption of regularity and accuracy to the records, and they are admissible without proof of additional foundational facts beyond the general requirements of Rule 44(a)(1).

577 P.2d at 1073 (citations omitted).[3]

■ As in *Sullivan*, there was a detailed explanation regarding hospital procedure and protocol in Gilpin's case. Gilpin, however, has failed to offer any evidence that her blood samples were tampered with or plausibly suggest the same from the record. Gilpin has merely shown that the hospital personnel who handled her blood were unable to independently recollect the circumstances surrounding its chain of custody. Based on preliminary hearing testimony by those present in the trauma room when Gilpin was admitted, the district court found:

The persons in the trauma room follow a strict protocol.... There are six people who have immediate access to the patient. Those six people would be an anesthesiologist or a respiratory therapist, the emergency room physician, the trauma surgeon, a trauma nurse, a resident or other physician, and another nurse....

Prior to a patient arriving at the trauma room, the trauma surgeon orders a "trauma pack" which is a standard set of laboratory studies done on all patients the exact same way. One of the laboratory studies included in the trauma pack is a test to determine if there is alcohol in the patient's blood.

The blood sample is drawn with a syringe, usually by a phlebotomist at the direction of the trauma surgeon. If the phlebotomist is unable to draw the sample because of the condition of the patient, then he will ask a physician to do it. If a physician draws the blood sample, the syringe used to withdraw the blood is handed to the phlebotomist after the blood is drawn.

Once the phlebotomist has the syringe of blood, he then puts the blood into several, evacuated glass or plastic tubes. The tubes are closed with rubber stoppers, and the stoppers must be punctured with the syringe's needle to fill them with blood.

The patient has to have a name band on before the blood is drawn. That name band includes a unique patient number and medical record number. The phlebotomist must identify the patient at the bedside. Once the blood is drawn and injected into the tubes, the phlebotomist then labels each tube and checks the label on the tubes with the label on the patient, to make sure that they match. The tubes are then transported immediately to the laboratory and turned over to the medical technologist.

When the medical technologist receives the blood samples, she cannot run a test on them unless they are identified with the patient's name, the medical record number, and the date and time the blood was drawn. If that information is not on the tubes, the phlebotomist must re-draw the blood and re-identify the patient. The phlebotomist must also have his initials on each tube of blood.

The medical technologist tests the samples immediately upon receiving them. They are not stored for a while until the tests are run. After the test is complete,

---

**3.** At the time relevant in *Sullivan,* Rule 44(a)(1) of the Alaska Rules of Civil procedure provided in relevant part:

(1) *Admissibility.* Writings offered as memoranda or records of acts, conditions, or events are admissible as evidence of the facts stated therein if the court finds that they were made in the regular course of a business at or about the time of the act, condition or event recorded, and that the sources of information from which made and the method and circumstances of their preparation were such as to indicate their trustworthiness.

the technologist again checks to make sure that the identification on the sample is correct.

The district court then concluded:

[T]he phlebotomist on duty cannot recall whether he drew the blood sample, or whether a doctor drew it. Considering the circumstances under which the blood sample was drawn, the State need not establish precisely who drew the blood sample in order to lay a foundation for its admissibility into evidence. The blood sample was drawn at the direction of Dr. Livingston by either the phlebotomist or by one of the two physicians or by one of the two nurses. The evidence indicates that they would all be competent to draw the blood sample. In addition, there were no other patients in the trauma room when the Defendant arrived. Thus, the likelihood that the blood was drawn from the wrong patient is virtually nonexistent.

The district court's findings are supported by substantial and competent evidence from the preliminary hearing.

Gilpin presents us with no reason to believe hospital procedures were not followed in this case. Gilpin was assigned an identity, with a PIN and MRN. Gilpin's PIN and MRN are present on records which identify her by her real name and are also present on the lab reports that indicate her blood alcohol level was .22. The PIN and MRN assigned to Gilpin, and found in the medical records and test results, are the most reliable evidence which shows that the blood sample which tested for high levels of alcohol belonged to Gilpin.

We are satisfied that the state has carried its burden of showing the blood samples belonged to Gilpin. Gilpin has failed to offer any evidence of tampering or mishandling. Therefore, we conclude the district court did not abuse its discretion when it denied Gilpin's motion to suppress the blood test results.[4]

### 3. Due Process

■ Gilpin's claim that her rights to due process were violated is a matter of law, which we review freely. *State v. Gray*, 129 Idaho 784, 796, 932 P.2d 907, 919 (Ct.App. 1997). Gilpin argues that her due process rights were violated because the hospital staff failed to provide sufficient written documentation regarding the chain of custody for Gilpin's blood tests.

■ The Fourteenth Amendment to the United States Constitution provides, in part: "[N]or shall any State deprive any person of life, liberty, or property, without due process of law." Private action is immune from the restrictions of the Fourteenth Amendment; it is axiomatic that the state must affirmatively take action, in some way, in order to deprive an individual of his or her right to due process. *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 359–50, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). *See also State v. Ankney*, 109 Idaho 1, 3, 704 P.2d 333, 335 (1985). Accordingly, when analyzing a due process claim, the court must first determine whether there has been state action. Next, the court must determine whether that state action deprived the person of a right enumerated in the Fourteenth Amendment. In this

4. One might question the legal efficacy and viability of the procedure which brings this appeal to the attention of this Court in the first place, *i.e.* a conditional plea agreement wherein the defendant reserved the right to appeal the district court's rulings on defendant's *pretrial motions to suppress and dismiss*.

Our Supreme Court in *State v. Hester*, 114 Idaho 688, 700, 760 P.2d 27, 39 (1988) has specifically noted that motions in limine seeking advanced rulings on the admissibility of evidence are fraught with problems because they are necessarily based upon an alleged set of facts rather than the actual testimony which the trial court would have before it at trial in order to make its ruling. The trial court, in the exercise of its

discretion, may decide that it is inappropriate to rule in advance on the admissibility of evidence based on a motion in limine, but may defer its ruling until the case unfolds and there is a better record upon which to make its decision. *Id.*

In this case, an adverse evidentiary ruling against the state, based upon foundational or other factual grounds, could well be rectified by the time of trial. In effect, an advance ruling on the evidence at this stage of the proceedings may be little more than interlocutory or advisory in nature, serve to alert a party to potential pitfalls that can be later cured or reconsidered, and duplicate the work of the trial judge. The defense bar should keep this in mind before using this type of evidentiary motion.

case, Gilpin has failed to establish either prong of the due process test.

Gilpin cites *Bourgeois v. Murphy,* 119 Idaho 611, 809 P.2d 472 (1991) in support of her proposition that her due process rights were violated. In *Bourgeois,* an inmate's urine sample was taken and tested by the state of Idaho Department of Corrections. The Idaho Supreme Court held that the *state's* procedure for handling urine samples at the Department of Corrections violated the inmate's constitutional right to due process. The state admitted that there existed *no* written documentation concerning the chain of custody for the urine sample taken by the state from the inmate. *Bourgeois,* 119 Idaho at 620, 809 P.2d at 481.

■ In Gilpin's case, however, the blood was drawn by a private hospital, at the direction of a private physician, for the purpose of treating Gilpin. There is no evidence that state action occurred at the time the blood was drawn on the basis that it was done pursuant to the instructions of a police officer. Therefore, if Gilpin's argument is that the hospital violated her due process rights at that time, she has failed to show any state action.

Gilpin's appellate brief states that a "private hospital in its deliberate abandonment of chain of custody record keeping has created a situation in which the rights of [Gilpin] are abridged if unreliable medical samples are used in State criminal legal proceedings without a proper chain of custody." Essentially, Gilpin is inviting us to hold that a private entity becomes an instrument of the state in every prosecution where the private entity conducts testing for medical purposes and the test results are later used in criminal prosecution. This we decline to do.

■ If Gilpin's argument under *Bourgeois* is that the hospital violated her due process rights in its handling of the blood samples, we disagree. In Gilpin's case, the hospital provided ample documentation: the hospital kept documents containing Gilpin's MRN and PIN numbers, which provide a reasonable method of tracking the blood samples. Gilpin has not shown a sufficient break in the chain of custody or demonstrated that anyone tampered with the evidence. Thus, as stated above, we conclude the evidence to be reliable and, therefore, Gilpin has failed to show that the actions by the hospital in this case violated her rights to due process.

## III.

## CONCLUSION

We hold the magistrate did not err when it admitted the blood test results by affidavit at the preliminary hearing under I.C.R. 5.1 and considered them in making its determination of probable cause. In addition, we conclude that there was sufficient evidence to support the district court's finding that there was a lack of proof the blood samples were tampered with, and also conclude the district court did not misperceive the evidence. Furthermore, we conclude the district court did not abuse its discretion when it denied Gilpin's motion in limine, determining that there could be sufficient foundation laid regarding the blood's chain of custody. Lastly, Gilpin has failed to prove that there was any state action or that the actions by the hospital violated Gilpin's rights to due process. Therefore, Gilpin's judgment of conviction for vehicular manslaughter is affirmed.

Judge SCHWARTZMAN, CONCURS.

J. LANSING, CONCURRING IN THE RESULT.

I concur in the Court's opinion with the exception of Section II(B)(1). As to that section, I concur in the result.

I cannot agree that the record contains substantial evidence to support the trial court's finding that the description of "Unknown Fulton" as a ninety-four-year-old male in Gilpin's medical records was a part of a pseudo-identity purposely assigned to Gilpin at the hospital. While it is clear from testimony of hospital personnel that the name "Unknown Fulton" was a fictitious name assigned in order to save time or because the hospital staff did not yet know the patient's true name, the testimony provides no explanation as to whether the description of the patient as a ninety-four-year-old male was a part of this assigned pseudo-identity or was a mistake. In examining the witnesses, neither the prosecutor nor the defense attorney

elicited a direct explanation of how that patient description made its way into Gilpin's records.

Although I view the trial court's finding to be unsupported by the evidence in this regard, it does not follow that Gilpin's motion in limine should have been granted. By filing a pretrial motion for an order excluding the blood test results on the ground of lack of foundation, Gilpin assumed the burden to show that the State could not possibly lay a sufficient foundation for introduction of the tests at trial. To support her motion in limine, Gilpin relied solely upon the transcript of the preliminary hearing. This transcript did not meet her burden of proof, for although the State did not at the preliminary hearing give a satisfactory explanation for the misdescription of Gilpin as an elderly male, that does not establish that the State would have been unable to do so at trial. Moreover, even if the State were unable to explain the source or basis of the misdescrip-tion at trial, that would not necessarily preclude admission of the blood samples, for a trial court reasonably could conclude that a sufficient foundation showing that the blood samples were those of Gilpin was established from the testimony describing how the samples were handled and from the evidence that the sample labels bore the unique medical record number assigned to Gilpin upon her admission to the emergency room. In sum, Gilpin did not show that the misdescription was the result of such a mistake or mishandling of the blood samples that it would be impossible for the State to establish an adequate foundation for the evidence at trial. Therefore, I join in the majority's ultimate determination affirming the denial of the motion in limine.