166 P.3d 387

STATE of Idaho, Plaintiff–Respondent,

v.

Isaac Burton WILLIAMSON,
Defendant–Appellant.

No. 33068.

Court of Appeals of Idaho.

May 17, 2007.

Rehearing Denied July 5, 2007.

Review Denied Aug. 31, 2007.

Isaac Burton Williamson, Boise, pro se appellant.

Hon. Lawrence G. Wasden, Attorney General; Lori A. Fleming, Deputy Attorney General, Boise, for respondent.

PERRY, Chief Judge.

Isaac Burton Williamson appeals from the intermediate appellate order of the district court affirming Williamson's judgment of conviction for exceeding the speed limit. For the reasons set forth below, we affirm.

## I.

### FACTS AND PROCEDURE

Two police officers, one acting as a spotting officer and the other as a chase officer, were part of a traffic enforcement unit. The spotting officer was positioned on an overpass where he could see vehicles traveling on the roadway below. The spotting officer visually determined that a vehicle, driven by Williamson, was traveling in excess of the speed limit. The spotting officer confirmed his visual estimation with a laser speed detection device and then reported to the chase officer that the vehicle was traveling at 76 mph. The posted speed limit was 55 mph. The spotting officer also relayed to the chase officer the make and model of Williamson's vehicle. The chase officer, in a separate police vehicle, pursued Williamson's vehicle and was guided directly behind it via radio by the spotting officer who was visually monitoring the pursuit from his vantage point. Acting on the information relayed to him, the chase officer stopped Williamson and issued him a citation.

At trial, both police officers testified, as did Williamson, who was acting pro se. After trial, the magistrate found Williamson guilty of driving a vehicle in excess of the maximum speed limit, I.C. § 49-654(2), and entered a judgment of conviction. Williamson appealed his judgment of conviction to the district

court, which the district court affirmed. Williamson again appeals.

## II.

## ANALYSIS

■ On review of a decision of the district court, rendered in its appellate capacity, we examine the record of the trial court independently of, but with due regard for, the district court's intermediate appellate decision. *State v. Bowman,* 124 Idaho 936, 939, 866 P.2d 193, 196 (Ct.App.1993). On appeal, Williamson challenges the admissibility of the results of the laser speed detection device and a portion of the chase officer's testimony. Williamson also challenges the sufficiency of the evidence to sustain his judgment of conviction.

### A.  Admissibility of Evidence

■ The decision whether to admit evidence at trial is generally within the province of the trial court. A trial court's determination that evidence is supported by a proper foundation is reviewed for an abuse of discretion. *State v. Gilpin,* 132 Idaho 643, 646, 977 P.2d 905, 908 (Ct.App.1999). Therefore, a trial court's determination as to the admission of evidence at trial will only be reversed where there has been an abuse of that discretion. *State v. Zimmerman,* 121 Idaho 971, 973–74, 829 P.2d 861, 863–64 (1992). When a trial court's discretionary decision is reviewed on appeal, the appellate court conducts a multi-tiered inquiry to determine: (1) whether the lower court correctly perceived the issue as one of discretion; (2) whether the lower court acted within the boundaries of such discretion and consistently with any legal standards applicable to the specific choices before it; and (3) whether the lower court reached its decision by an exercise of reason. *State v. Hedger,* 115 Idaho 598, 600, 768 P.2d 1331, 1333 (1989).

### 1.  General reliability of laser devices

■ On appeal, Williamson asserts the magistrate abused its discretion in admitting the results of the laser speed detection device. Williamson argues the state failed to present scientific evidence of the laser's general reliability and, as a result, the evidence is inadmissible. While not entirely clear, Williamson also appears to argue that because the magistrate did not take judicial notice of the general reliability of the laser to measure speed and the state did not request it do so, the magistrate erred in admitting the evidence absent such judicial notice.

■ We note initially that when a party appeals the decision of an intermediate appellate court, the appellant may not raise issues that are different from those presented to the intermediate court. *State v. Sheahan,* 139 Idaho 267, 275, 77 P.3d 956, 964 (2003). While the parties' briefs submitted to the district court are not in the record before us, the district court's order affirming Williamson's judgment of conviction is. The language of the district court's order makes it unclear whether, on intermediate appeal, Williamson challenged the state's evidence establishing the accuracy of the individual laser used by the spotting officer or the scientific reliability of lasers in general. However, because the issues framed by the intermediate court's opinion could have included the reliability of lasers in general, we consider Williamson's argument on appeal.

Previously, we have accepted the general reliability of radar speed detection devices. *See State v. Kane,* 122 Idaho 623, 624, 836 P.2d 569, 570 (Ct.App.1992). We accepted the general reliability of such devices on the basis of decided cases in other jurisdictions in the absence of any relevant Idaho statute. *Id. See also State v. Garrett,* 119 Idaho 878, 881, 811 P.2d 488, 491 (1991) (holding the nystagmus eye test may provide probable cause to arrest in driving under the influence cases as multiple jurisdictions have concluded it is scientifically, generally reliable.)

Similarly, the general reliability of laser speed detection devices has also been accepted in other jurisdictions. *See* Ga.Code Ann. § 40–14–17 (evidence of speed based on a laser detection device is considered scientifically reliable and admissible); Va.Code Ann. § 46.2–882 (speed of any motor vehicle may be determined by the use of a laser speed determination device); *State v. Stoa,* 112 Hawai'i 260, 145 P.3d 803, 809–11 (Ct.

App.2006) (laser speed device results are premised on well understood scientific principles); *Goldstein v. State,* 339 Md. 563, 664 A.2d 375, 381 (1995) (results of a laser speed device were admissible as they are premised on reliable, well-understood scientific principles); *State v. Abeskaron,* 326 N.J.Super. 110, 740 A.2d 690, 694 (App.Div.1999) (affirming lower court's determination that laser devices, subject to listed restrictions, are an appropriate tool to measure speed); *City of Columbus v. Barton,* 106 Ohio Misc.2d 17, 733 N.E.2d 326, 327 (1994) (laser device is a reliable and accurate method of scientifically measuring the speed of a moving object); *Jury v. State, Dept. of Licensing,* 114 Wash. App. 726, 60 P.3d 615, 619 (2002) (acknowledging that laser speed detection technology is accepted in other jurisdictions as scientifically reliable).

On the basis of decided cases and law in other jurisdictions, and in the absence of any relevant Idaho statute, we hold that laser speed detection devices are generally reliable and their results may be admitted into evidence in Idaho courts. Because the reliability of the laser is generally accepted, the magistrate did not err in admitting the evidence in the absence of taking specific judicial notice or the state presenting scientific evidence of the laser's reliability. Accordingly, we conclude the magistrate did not abuse its discretion in admitting the laser results.

## 2. Foundation for admission of laser results

■ Williamson also asserts that, even if lasers are generally reliable, the magistrate abused its discretion in admitting the results of the laser device because the spotting officer's testimony failed to lay a proper foundation for the admission of those results. Specifically, Williamson argues that the state failed to establish that the spotting officer was qualified to operate a laser device or that the unit was properly maintained or used correctly.

■ As with radar devices, we conclude that, when a laser device is used to determine a defendant is driving in excess of the maximum speed limit, the proper use and accuracy of the device in question must be established by the state in order to introduce the evidence at trial. *See Kane,* 122 Idaho at 624–25, 836 P.2d at 570–71. Therefore, in each speeding prosecution that seeks to introduce laser evidence, the state must prove that the officer was qualified to operate the device, that the unit was properly maintained, and that it was used correctly. *See id.*

■ Generally, issues not raised below may not be considered for the first time on appeal. *State v. Fodge,* 121 Idaho 192, 195, 824 P.2d 123, 126 (1992). For an objection to be preserved for appellate review either the specific grounds for the objection must be clearly stated or the basis of the objection must be apparent from the context. *Sheahan,* 139 Idaho at 277, 77 P.3d at 966. An objection is not preserved for review when the objection argued on appeal was either distinct from that raised below or the evidence objected to below and on appeal was substantially different. *Id.*

Williamson never objected to the admission of the results of the laser device on the basis that there was insufficient foundation establishing the spotting officer's ability to correctly use the device or that the device was properly maintained. On the contrary, a review of the trial transcript indicates Williamson accepted and understood the evidence presented which demonstrated the spotting officer had been trained to use the laser device. Williamson did, however, properly object to the introduction of the results of the laser device at trial. This objection was based on the specific grounds that the state failed to provide evidence demonstrating the scientific reliability of laser devices generally. This objection to the admission of the laser device evidence was distinctly different from the challenge to foundation he now raises for the first time on appeal. Accordingly, we will not consider this issue on appeal.

■ Moreover, even if we were to consider Williamson's new argument on appeal, the spotting officer testified that he was certified in the use of laser, that the laser had been calibrated by city maintenance shops, and that he had tested the laser to make sure it

was working correctly on the day in question. The spotting officer also testified that he used the device correctly and specified the method he used. Therefore, even liberally construing Williamson's objection to encompass the argument he now makes on appeal, we conclude that the magistrate did not abuse its discretion in holding the state had established a proper foundation for the entry into evidence of the laser's results.

### 3. Admissibility of chase officer's testimony

For the first time on appeal, Williamson argues the chase officer's testimony, that the spotting officer informed him via radio that Williamson was traveling at 76 mph was inadmissible hearsay. At trial, Williamson did not object to the chase officer's testimony regarding the speed reported to him by the spotting officer. Instead, Williamson objected to the chase officer's testimony that he stopped the car the spotting officer determined should be pulled over. Williamson also objected to the officer's testimony identifying Williamson as the individual he pulled over on the night in question.

As noted, issues not raised below may not be considered for the first time on appeal. *Fodge,* 121 Idaho at 195, 824 P.2d at 126. Williamson did make proper objections to certain elements of the chase officer's testimony at trial. However, because Williamson never objected to the chase officer's testimony regarding the speed at which Williamson was driving, the question of whether that testimony constitutes hearsay was not preserved below. Therefore, we decline to consider this issue on appeal.

### B. Sufficiency of the Evidence

Appellate review of the sufficiency of the evidence is limited in scope. A finding of guilt will not be overturned on appeal where there is substantial evidence upon which a reasonable trier of fact could have found that the prosecution sustained its burden of proving the essential elements of a crime beyond a reasonable doubt. *State v. Herrera–Brito,* 131 Idaho 383, 385, 957 P.2d 1099, 1101 (Ct.App.1998); *State v. Knutson,* 121 Idaho 101, 104, 822 P.2d 998, 1001 (Ct.

App.1991). We will not substitute our view for that of the trier of fact as to the credibility of the witnesses, the weight to be given to the testimony, and the reasonable inferences to be drawn from the evidence. *Knutson,* 121 Idaho at 104, 822 P.2d at 1001; *State v. Decker,* 108 Idaho 683, 684, 701 P.2d 303, 304 (Ct.App.1985). Moreover, we will consider the evidence in the light most favorable to the prosecution. *Herrera–Brito,* 131 Idaho at 385, 957 P.2d at 1101; *Knutson,* 121 Idaho at 104, 822 P.2d at 1001.

Williamson asserts that the state failed to present evidence sufficient to establish the speed he was traveling at when the police decided to stop him and issue a citation. Williamson also asserts the state failed to present evidence sufficient to prove that the chase officer stopped the correct vehicle.

Idaho Code Section 49–654(2) provides that, "where no special hazard or condition exists that requires lower speed for compliance with subsection (1) of this section the limits as hereinafter authorized shall be maximum lawful speeds, and no person shall drive a vehicle at a speed in excess of the maximum limits." At trial, the state presented testimony that Williamson's vehicle was witnessed by the spotting officer as traveling in excess of the posted speed limit. Testimony was presented that Williamson was traveling at 76 mph in a zone where the maximum speed limit was 55 mph. The state also presented testimony that the chase officer was directed specifically to Williamson's vehicle by the spotting officer and that the chase officer identified Williamson as the man he stopped and cited. Upon review of the record, the state presented substantial evidence upon which the magistrate could have reasonably concluded it met its burden of proving beyond a reasonable doubt that Williamson was driving his vehicle in excess of the posted speed limit in violation of I.C. § 49–654(2).

### III.

### CONCLUSION

We hold that laser speed detection devices are generally reliable and their results may be admitted into evidence in Idaho courts.

Therefore, the district court did not abuse its discretion in admitting evidence of the results of the laser absent specific judicial notice regarding, or presentation of scientific evidence demonstrating, the reliability of laser speed detection devices generally. Williamson did not object to any lack of foundation for admitting the laser results and, even if he had, the spotting officer's testimony established sufficient foundation for the admission of the evidence. Williamson also failed to make a hearsay objection to the chase officer's testimony regarding the speed of Williamson's vehicle and, therefore, the issue cannot be considered for the first time on appeal. Finally, the state presented sufficient evidence upon which a reasonable trier of fact could have found the state proved beyond a reasonable doubt that Williamson was driving his vehicle in excess of the maximum lawful speed limit. Accordingly, we affirm the order of the district court, in intermediate appeal, affirming Williamson's judgment of conviction.

Judge GUTIERREZ, concurs.

Judge LANSING, concurring.

I concur with the conclusions of the majority, but write separately to further explain the legal standards that, in my view, are applicable when courts judicially recognize the accuracy of a scientific device, and to caution against the inappropriate loosening or disregard of those standards at the trial court or appellate court level.

Generally, where evidence derived from new technology or new scientific techniques is proffered, the foundation must include a showing that the methodology or scientific principle employed is reliable and yields accurate information or test results. *See generally State v. Perry*, 139 Idaho 520, 522–23, 81 P.3d 1230, 1232–33 (2003) (evidence of polygraph results); *Swallow v. Emergency Medicine of Idaho, P.A.*, 138 Idaho 589, 592–93, 67 P.3d 68, 71–72 (2003) (medical opinion regarding effect of medication overdose); *State v. Konechny*, 134 Idaho 410, 417–18, 3 P.3d 535, 542–43 (Ct.App.2000) (methodological basis for counselor's opinion that child was sexually abused). Over time, however, as a particular scientific methodology be-

comes less novel and more broadly accepted, appellate courts may determine that the methodology is reliable or, more precisely, may "take judicial notice" of that reliability. Such a determination by an appellate court relieves proponents of the evidence of the need to present foundational evidence in the trial court to show the scientific underpinnings and general reliability of the methodology.

Idaho case law is not uniform in the terminology used when an appellate court deems a particular device or scientific principal reliable enough for the admission into evidence of its reports or results. Idaho's appellate decisions have sometimes simply acknowledged or recognized the general acceptance and reliability of the principle or apparatus involved, *State v. Rodgers*, 119 Idaho 1047, 1049–51, 812 P.2d 1208, 1210–12 (1991) (blood spatter interpretation); *State v. Garrett*, 119 Idaho 878, 880–81, 811 P.2d 488, 490–91 (1991) (use of horizontal gaze nystagmus testing to show defendant under the influence of alcohol); *State v. Hartwig*, 112 Idaho 370, 732 P.2d 339 (Ct.App.1987) (use of Intoximeter 3000 to measure breath alcohol concentration), while at least one other decision has taken "judicial notice" of that reliability. *State v. Kane*, 122 Idaho 623, 624, 836 P.2d 569, 570 (Ct.App.1992) (use of radar to measure speed). In my view, the appellate court's action in each such case amounts to taking judicial notice of foundational facts—a procedure that is permissible under Idaho Rule of Evidence 201—regardless of whether judicial notice terminology was used in the opinion. The utilization of judicial notice in this context is explained in a well-known treatise as follows:

> It is manifest, moreover, that the principle involved need not be commonly known in order to be judicially noticed; it suffices if the principle is accepted as a valid one in the appropriate scientific community. In determining the intellectual viability of the proposition, of course, the judge is free to consult any sources that he thinks are reliable, but the extent to which judges are willing to take the initiative in looking up the authoritative sources will usually be limited.... And, it should be noted that

after a number of courts take judicial notice of a principle, subsequent courts begin to dispense with the production of these materials and to take judicial notice of the principle as a matter of law established by precedent.

2 McCormick on Evidence § 330 (Kenneth S. Broun ed., 6th ed.2006) (footnotes omitted).

As observed by McCormick in this passage, in evaluating whether to accept the general reliability of a scientific device or principle, appellate courts often rely heavily on decisions from other jurisdictions. In my judgment, that is appropriate only when it is apparent that there was a factual basis, either in their evidentiary records or in publications or other sources consulted by those courts, for the courts' determinations of reliability. Indeed, our Supreme Court has warned that the acceptance of a particular methodology by other jurisdictions should not be followed in lock-step, but instead is persuasive only as those decisions "contain analysis and reasoning which recommends itself to this Court." *See Garrett,* 119 Idaho at 880 n. 3, 811 P.2d at 490 n. 3. Appellate decisions that simply declare a device or scientific methodology reliable without explanation are of little value in this inquiry. It is principally this concern that causes me to write separately.

There are three decisions from other jurisdictions that I find provide a persuasive basis to take judicial notice that laser speed detection devices generally provide accurate measurement of vehicle speeds. One is *Goldstein v. State,* 339 Md. 563, 664 A.2d 375 (1995), where the court held that laser speed measurements are sufficiently reliable to be admitted into evidence. In the course of reaching that holding, the court explained that laser devices are technologically premised on well-understood scientific principles similar to those that underlie an older, widely accepted speed detection device, radar:

> Our analysis begins by examining the operation of the LTI 20–20 [laser device]. The theory underlying the LTI 20–20 would be familiar to any student of high school physics. In fact, laser speed devices operate on the same principles as military radar (police radar works somewhat differently). *See 1 McCormick on Evidence* § 204, at 880 (J. Strong 4th ed.1992). McCormick explains military radar as follows:
>
> > The radar antenna transmits microwave radiation in pulses. The equipment measures the time it takes for a pulse to reach the target and for its echo to return. Since the radiation travels at a known speed (the speed of light), this fixes the distance to the target. The changes in the distances as determined from the travel times of later pulses permit the target's velocity to be computed. *Id.* § 204, at 880 n. 17.
>
> Laser speed measurements work exactly the same way, except that the device relies on lasers rather than microwave radiation. Laser is an acronym for "light amplification by stimulated emission of radiation." 15 *Funk & Wagnalls New Encyclopedia* 410 (R. Phillips ed., 1983).
>
> Lasers are devices that amplify light and produce coherent light beams, ranging from infrared to ultraviolet. A light beam is coherent when its waves, or photons, propagate in step with one another. Laser light, therefore, can be made extremely intense, highly directional, and very pure in color (frequency). *Id.*
>
> Light and microwaves, the building blocks of lasers and radar, respectively, occupy different points on the electromagnetic spectrum but are otherwise similar. P. Tipler, *Physics* 852–54 (2d ed.1982). According to the State's expert, the main advantage that lasers offer over radio-micro waves is that the beam is narrower and therefore easier to keep focused on the target vehicle.

*Goldstein,* 664 A.2d at 379.

Another particularly important decision is *In re Admissibility of Motor Vehicle Speed Readings Prod. by the LTI Marksman 20–20 Laser Speed Detection System,* 314 N.J.Super. 233, 714 A.2d 381 (Law Div.1998). There, a New Jersey trial court, in a special proceeding with participation of several defense attorneys serving as amici curiae, oversaw the extensive operational testing of a particular laser speed detector. The court's

opinion describes the testing techniques and results in detail, and concludes that the laser device produced reasonably reliable and uniform results.[1] The court explained the laser's operation as follows:

A laser is an artificially generated and amplified light which is in the infrared light section of the electromagnetic wave spectrum. It is not visible to the naked eye. It is very concentrated. The laser speed detector fires a series of laser pulses at a selected remote target. When the laser light strikes the target, a portion of the light is reflected back to the detector. Since the speed of light is a known constant, by measuring the time it takes for the laser pulse to travel to the target and back, the detector is able to calculate the distance between the detector and the target. Each laser pulse which is fired and reflected back establishes one distance reading. The laser speed detector fires 43 laser pulses every time the trigger on the detector is squeezed. These 43 pulses are fired in a total period of approximately one-third of a second. If the target at which the laser pulses are fired is a stationary target, each of the 43 pulses will give the same distance reading to the target, and distance will be the only thing that the detector can tell us about the target. However, if the target is moving, each of the 43 pulses will give a slightly different distance reading and the detector can then compute the velocity or speed of the target from the changes in distance divided by the known elapsed time between the firing of each of the laser pulses. In simplest terms, this is the basic theory underlying the use of lasers to calculate speed, and there can be no dispute about its fundamental validity.

*Id.* at 383–84.

Finally, the Hawaii Court of Appeals in *State v. Stoa,* 112 Hawai'i 260, 145 P.3d 803 (Ct.App.2006), surveyed appellate decisions of other states and also consulted other literature addressing the reliability of laser speed-measuring devices and their scientific underpinnings. That decision includes the following description of the similarities of and distinctions between radar and laser speed detection devices:

(1) The laser gun has a very narrow beam (about three feet wide at a distance of 1000 feet), so that it can pick out a single car for measurement, while the radar beam is roughly 100 times wider (about 300 feet wide at 1000 feet) and can easily have a dozen cars in its beam simultaneously.

(2) Laser speed guns make a direct measurement of how the position of the target changes in time . . ., while radar infers the speed from the Doppler-shifted frequency of the reflected waves.

(3) The laser results are calculated and error-checked by a microprocessor, which verifies the individual measurements and the final speed result. . . .

(4) Radar has the advantage of being better in poor visibility weather conditions (fog, rain, snow, etc.). However, the value of radar's bad-weather capability is questionable, since traffic stops are less likely to be made under bad weather conditions for other reasons, primarily safety concerns.

(5) Radar speed guns can be set up to continuously monitor oncoming traffic without active operator attention, while the laser gun must be carefully aimed and triggered by the operator for each individual measurement.

(6) Laser speed guns are more immune to interference from natural and artificial environmental sources than radar guns. . . .

*Stoa,* 145 P.3d at 810 (quoting 1 Campbell, Fisher & Mansfield, *Defense of Speeding, Reckless Driving and Vehicular Homicide* § 9a.02[6], at 9a–9 (2005)). The Hawaii court ultimately determined that it was appropriate to "join the other states that have taken judicial notice of the scientific acceptance of the accuracy and reliability of laser speed-measuring devices." *Id.* at 811.

*Abeskaron,* 326 N.J.Super. 110, 740 A.2d 690, 694 (App.Div.1999).

---

1. A New Jersey appellate court approved the trial court's findings and conclusions. *See State v.*

The factual investigations and analyses in the foregoing decisions convince me that this Court should also take judicial notice of the accuracy and reliability of laser speed detection devices just as we, fifteen years ago, took judicial notice of the reliability of radar used for speed measurements in *Kane*, 122 Idaho at 624, 836 P.2d at 570.

This judicial notice does not, of course, provide the full foundational basis for admission of the speed readings from laser devices. As noted by the majority, it remains necessary to also provide foundation showing that the officer was trained to operate the device, that the device was properly maintained, and that it was used correctly. Even when these foundational prerequisites are met, however, a laser reading is not conclusive of a vehicle's speed. The opposing party may challenge the accuracy of the reading by showing that the accuracy is doubtful due to flaws in the individual device used, weather conditions, operator error, or other factors.

Lastly, I would note that our decision today applies to the general technique of laser speed measurements and not to a particular individual instrument. Indeed, the record before this Court does not disclose the brand or model of the device used here. A brand-by-brand approval of particularized laser devices should not be necessary to a finding of the general reliability of the overall scientific process. The lead opinion implicitly holds, and I would agree, that the adversarial process is the appropriate avenue to expose design flaws in any particular model of laser speed measuring device.[2] *See Goldstein*, 664 A.2d at 381; *Stoa*, 145 P.3d at 809.

In conclusion, it is my opinion that judicial notice of the accuracy and reliability of a scientific principle or methodology should not be lightly taken. That a few other jurisdictions have done so is not a sufficient basis unless those other jurisdictions present an adequate justification for their conclusions. Likewise, for trial courts, an adequate foundation is not drawn from the mere fact that a device is being used by local law enforcement agencies. This being said, I concur with the majority conclusion that the time has come to judicially recognize the general reliability of laser speed detectors, eliminating the need for detailed foundational evidence concerning their general accuracy or the underlying science.

---

**2.** Perhaps the most effective and desirable method for assuring the accuracy and reliability of laser devices would be a state agency certification system similar to that which is currently provided for alcohol breath testing devices, *see* I.C. § 18–8004(4); IDAPA 11.03.01.013, but the Idaho legislature has not, to this point, called for such a certification process.