**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 36394**

| | |
|---|---|
| STATE OF IDAHO, | ) |
| | ) **2010 Opinion No. 73** |
| Plaintiff-Respondent, | ) |
| | ) **Filed: November 5, 2010** |
| v. | ) |
| | ) **Stephen W. Kenyon, Clerk** |
| FILIP DANNEY aka FILIP VOGELPOHL, | ) |
| | ) |
| Defendant-Appellant. | ) |
| | ) |

Appeal from the District Court of the Fourth Judicial District, State of Idaho, Ada County. Hon. Michael R. McLaughlin, District Judge.

Order denying motion to suppress evidence, <u>affirmed</u>.

The Cox Law Firm, Boise, for appellant. Sean C. Beaver argued.

Hon. Lawrence G. Wasden, Attorney General; Mark W. Olson, Deputy Attorney General, Boise, for respondent. Mark W. Olson argued.

_____

LANSING, Chief Judge

Filip Danney (aka Vogelpohl) appeals from the judgment of conviction entered upon his conditional guilty plea to trafficking in marijuana. He challenges the denial of his motion to suppress evidence that was gained by police from placement of a global positioning system (GPS) tracking device on his vehicle and contends that the police lacked the requisite reasonable suspicion to expand a traffic stop into a drug investigation. We affirm.

**I.**

**FACTS AND PROCEDURE**

The evidence from the suppression hearing indicated that in March 2007, Ada County Detective Matt Taddicken received an anonymous tip that Danney was potentially connected to a marijuana trafficking ring. Based on this information, Detective Taddicken searched Danney's discarded trash outside his residence numerous times, eventually discovering items bearing the name Filip Vogelpohl, an alias of Danney's, a tissue bearing marijuana residue, a heat-sealed plastic bag, and some sections that appeared to be cut from similar bags. On approximately

1

May 16, 2007, Detective Taddicken located a vehicle registered in Danney's name parked outside Danney's business and placed a GPS tracking device on it. On May 21, via an online program that tracked the location of the GPS device, Detective Taddicken noticed that Danney's vehicle was in and around Arcata, California. The next day, the online tracking program indicated that the vehicle was traveling back toward Boise. Detective Taddicken notified Ada County Sheriff's Office Deputy Matthew Clifford when Danney's vehicle was entering Boise on return from California and told Clifford that the vehicle might contain drugs.

After watching Danney fail to signal for five seconds prior to changing lanes on two occasions, Deputy Clifford initiated a traffic stop. Deputy Clifford asked Danney where he was coming from. Danney replied that he had been at a sandwich restaurant and was on a "lunch break." Deputy Clifford returned to his vehicle where he called Detective Taddicken. Approximately six minutes into the stop, a backup officer arrived, and Deputy Clifford then deployed his drug dog to sniff the vehicle. The dog alerted, and a subsequent search of the vehicle revealed marijuana.

Danney was charged with felony trafficking in marijuana, Idaho Code § 37-2732B(a)(1). He filed a motion to suppress the evidence resulting from the traffic stop on the ground that the stop was unreasonably extended by the drug investigation procedures that were not justified by reasonable suspicion. At the hearing, he objected to admission of evidence gained from the GPS device on the ground that the State had not laid a sufficient foundation. The district court admitted the GPS evidence and denied the motion, finding that the officers had reasonable suspicion justifying extension of the stop to use a drug dog. Danney entered a conditional guilty plea to the charge, preserving his right to appeal the denial of his suppression motion.

## II.

## ANALYSIS

### A.    Foundation for GPS Evidence

We first address Danney's contention that the GPS evidence should not have been admitted at the suppression hearing because no proper foundation was laid. Danney argues there was insufficient evidentiary foundation to establish:    (1) the scientific principles and methodology behind the GPS tracking device, (2) that the particular GPS tracking device used in this case was functioning properly, (3) that Detective Taddicken followed the proper police

2

protocols when utilizing the GPS tracking device, and (4) that Detective Taddicken received accurate and reliable data from the GPS tracking device.

A trial court's determination whether evidence is supported by a proper foundation is reviewable under an abuse of discretion standard. *State v. Wilson*, 120 Idaho 643, 646, 818 P.2d 347, 350 (Ct. App. 1991). The foundation required to admit GPS data is a matter of first impression in Idaho. Generally, where evidence derived from new technology or new scientific techniques is proffered, the foundation must include a showing that the device or methodology employed is reliable and yields accurate information or test results. *State v. Williamson*, 144 Idaho 597, 602, 166 P.3d 387, 392 (Ct. App. 2007) (Lansing, J., concurring) (laser speed detection device). *See also State v. Perry*, 139 Idaho 520, 522-23, 81 P.3d 1230, 1232-33 (2003) (evidence of polygraph results); *Swallow v. Emergency Med. of Idaho, P.A.*, 138 Idaho 589, 592-93, 67 P.3d 68, 71-72 (2003) (medical opinion regarding effect of medication overdose); *State v. Konechny*, 134 Idaho 410, 417-18, 3 P.3d 535, 542-43 (Ct. App. 2000) (methodological basis for counselor's opinion that child was sexually abused). The proper use and accuracy of the particular device in question must be established. *Williamson*, 144 Idaho at 600, 166 P.3d at 390; *State v. Kane*, 122 Idaho 623, 624-25, 836 P.2d 569, 570-71 (Ct. App. 1992). For example, we have held that where the State seeks to admit a reading from a laser speed detection device, the State must prove that the officer was qualified to operate the device, that the unit was properly maintained, and that it was used correctly. *Williamson*, 144 Idaho at 600, 166 P.3d at 390.

At the suppression hearing, Detective Taddicken testified that he participated in training provided by the manufacturer of the device. He said that the GPS transmitter device was magnetically attached to the underside of Danney's vehicle and that it was still attached in the same spot when the traffic stop occurred. The detective testified that the device communicates with orbiting satellites and uses the information they transmit "to figure a location." Detective Taddicken testified as to the brand and model of the particular device and said that he had used this model previously in testing. He indicated that his department's testing of this and similar GPS devices produced "successful" and "reliable" results. He explained that before placing the GPS transmitter on Danney's vehicle, he had tested the device by putting it on his own vehicle and comparing his actual location to the location reported by the device as he drove around Boise. In this testing, the GPS's Internet transmissions were monitored either by Detective

Taddicken using a laptop computer in his patrol car with wireless Internet access, or by another officer on a computer at a remote location, and the device proved accurate. Detective Taddicken acknowledged that he did not know if there is an error rate for GPS devices and that he did not have knowledge of the engineering "behind the science of a GPS device" other than what he had explained concerning its use of satellite data transmissions.

We conclude that the district court did not abuse its discretion in holding that the State provided the requisite foundation for admission of the GPS evidence. Danney's assertion that the foundation was insufficient because Detective Taddicken admitted that he did not know the "science" behind GPS devices is not a correct application of the standard. It is not the engineering details of GPS technology that are critical but, rather, a demonstration that the device is accurate in the data it purports to provide, was operating properly at the time in question, and was used correctly by the operating officer. Detective Taddicken's testimony about the extensive testing of this GPS device and others like it and his training and experience in utilizing the device was sufficient to meet foundation standards. Further evidence of the device's accuracy is provided by the evidence that its transmissions led officers to the location of Danney's vehicle immediately preceding the traffic stop. The district court did not abuse its discretion in finding that sufficient foundation had been laid for admission of the GPS evidence.

## B. Fourth Amendment Challenge to Warrantless Use of GPS Device

Danney also contends that evidence gained from the GPS tracking device should have been suppressed because the warrantless placement of the device on his vehicle constituted a search prohibited by the Fourth Amendment. We do not reach this issue because it was not preserved for our review on appeal. Generally, issues not raised below may not be considered for the first time on appeal. *State v. Fodge*, 121 Idaho 192, 195, 824 P.2d 123, 126 (1992). Danney asserts that his general objection to use of the GPS evidence was sufficient to preserve the constitutional challenge. However, it is clear from the record that Danney objected to consideration of the evidence solely on the ground that the State had not provided sufficient foundation and made no contention that placement of the GPS device on his vehicle was itself a "search" subject to Fourth Amendment strictures. Therefore, the constitutional issue was not preserved for appellate review.

In the alternative, Danney contends that we should examine the constitutional challenge under a fundamental error analysis, which would allow us to address the issue for the first time

on appeal.  Idaho decisional law has long allowed appellate courts to consider a claim of error to which no objection was made below if the issue presented rises to the level of fundamental error. *See State v. Field*, 144 Idaho 559, 571, 165 P.3d 273, 285 (2007); *State v. Knowlton*, 123 Idaho 916, 918, 854 P.2d 259, 261 (1993); *State v. Haggard*, 94 Idaho 249, 251, 486 P.2d 260, 262 (1971).  Recently, however, in *State v. Perry*, ___ Idaho ___, ___ P.3d ___ (July 23, 2010) (reh'g pending), the Idaho Supreme Court abandoned the definitions it had previously utilized to describe what may constitute fundamental error.  The Supreme Court adopted instead a three-part definition patterned largely after the three-pronged test utilized by federal appellate courts to determine whether an error to which no objection was made below constitutes "plain error" that may nevertheless be addressed on appeal.  The *Perry* Court held that in order to raise a claim of fundamental error that may be considered for the first time on appeal:

> [T]he defendant bears the burden of persuading the appellate court that the alleged error:  (1) violates one or more of the defendant's unwaived constitutional rights; (2) plainly exists; and (3) was not harmless.  If the defendant persuades the appellate court that the complained of error satisfied this three-prong inquiry, then the appellate court shall vacate and remand.

*Id*. at ___, ___ P.3d at ___.

Applying this new test for fundamental error, we conclude that Danney's argument that the warrantless use of a GPS device to track his vehicle violated the Fourth Amendment does not demonstrate fundamental error because the second prong, requiring that the error "plainly exists," was not met.  With respect to this second prong of the *Perry* test, *Perry* explains that the error "must be clear or obvious, without the need for any additional information not contained in the appellate record, including information as to whether the failure to object was a tactical decision . . . ."  *Id*. at ___, ___ P.3d at ____.  Because our Supreme Court drew heavily upon the federal plain error doctrine in arriving at the *Perry* definition of fundamental error, we consult federal case law in elucidating the second element of the *Perry* test.  According to the United States Supreme Court's decision in *United States v. Olano*, 507 U.S. 725 (1993), "plain" is synonymous with "'clear' or, equivalently, 'obvious.'"  *Id*. at 734.  Thus, the inquiry is whether "the error is clear under current law," *id*., or, as articulated by the Ninth Circuit Court of Appeals, whether the "available authorities provide a clear answer to the question . . . ."  *United States v. Thompson*, 82 F.3d 849, 855 (9th Cir. 1996).  In *Thompson*, the court held that an issue raised for the first time on appeal was not "plain error" because there was at least some room for

5

doubt about the outcome of this issue since there was no controlling United States Supreme Court precedent and the other circuits were split. *Id. Accord United States v. Salinas*, 480 F.3d 750, 759 (5th Cir. 2007) (holding there was not "plain error" where the circuit's law was unsettled on the issue and other circuits had reached divergent conclusions); *United States v. Humphrey*, 164 F.3d 585, 588 (11th Cir. 1999) (holding where no precedent clearly resolved the defendant's claim of error, the error was not "obvious" and thus could not be reviewed under the plain error doctrine); *United States v. Alli-Balogun*, 72 F.3d 9, 12 (2d Cir. 1995) (holding that a claimed error could not be plain error when the Supreme Court and the Second Circuit had not spoken on the subject and the authority in the other circuits was split). We therefore conclude that the second element of the *Perry* test for fundamental error, requiring that the error "plainly exists," necessitates that the appellant show that existing authorities have unequivocally resolved the issue in the appellant's favor.

Danney's claim of fundamental error does not satisfy this test, for the law is not settled on whether use of a GPS device to track a vehicle's movements constitutes a "search" subject to the strictures of the Fourth Amendment. Neither the United States Supreme Court nor Idaho appellate courts have spoken to this issue, nor have the vast majority of the federal circuit courts. *See People v. Weaver*, 909 N.E.2d 1195, 1202 (N.Y. 2009) (noting that both the United States Supreme Court and most federal circuit courts had not yet ruled on the issue). To the extent that it has been addressed, the jurisprudence in this area is conflicting. The United States Supreme Court's decision that is closest on point is *United States v. Knotts*, 460 U.S. 276 (1983), where the Court examined the constitutionality of the warrantless use of a "beeper" device planted on a vehicle and used to track the progress of the vehicle by officers following the beeper's signals. The Court concluded that law enforcement officers did not conduct a "search" cognizable under the Fourth Amendment by using the beeper to track a vehicle because "[a] person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." *Id*. at 281. This was so, the Court said, because the particular route taken, stops made, and ultimate destination are apparent to any member of the public who happens to observe the vehicle's movements, and "[n]othing in the Fourth Amendment prohibited the police from augmenting the sensory faculties bestowed upon them at birth with such enhancement as science and technology afforded them in this case." *Id*. at 282. At least two federal circuit courts have held that the *Knotts* analysis applies equally to the more

6

technologically advanced GPS devices now used by law enforcement, concluding that the warrantless placement of a GPS tracking device on a vehicle does not implicate the Fourth Amendment. *United States v. Pineda-Moreno*, 591 F.3d 1212, 1216 (9th Cir. 2010); *United States v. Garcia*, 474 F.3d 994, 998 (7th Cir. 2007). *See also Osburn v. State*, 44 P.3d 523, 525-26 (Nev. 2002) (holding that the police use of an electronic mobile tracking device does not infringe a reasonable expectation of privacy). Of course, if *Knotts*, *Pineda-Moreno*, and *Garcia* control on this issue, then Danney has not only failed to show fundamental error, he has failed to show any error at all, for the officers' employment of a GPS device to track Danney's vehicle would not be deemed violative of the Fourth Amendment.

Danney points, however, to decisions of several state supreme courts that have held the use of a GPS tracking device without a warrant was impermissible under their respective state constitutions. *See Commonwealth v. Connolly*, 913 N.E.2d 356, 369 (Mass. 2009); *Weaver*, 909 N.E.2d at 1202; *State v. Campbell*, 759 P.2d 1040, 1041 (Or. 1988). Danney urges that we adopt the analysis of the *Weaver* court which, although deciding the issue according to state law, also strongly suggested that *Knotts* should be inapplicable to GPS technology. The *Weaver* court observed that while "[a]t first blush it would appear that *Knotts* does not bode well for Mr. Weaver, for in his case, as in *Knotts*, the surveillance technology was utilized for the purpose of tracking the progress of a vehicle over what may be safely supposed to have been predominately public roads and, as in *Knotts*, these movements were at least in theory exposed to anyone who wanted to look," this was where the similarity ended. *Weaver*, 909 N.E.2d at 1198-99 (quoting *Knotts*, 460 U.S. at 281). The court focused on the disparity in the technology, noting that the device used in *Knotts* was a "very primitive tracking device" which was "fairly described . . . as having functioned merely as an enhancing adjunct to the surveilling officers' senses . . . ," while "GPS is a vastly different and exponentially more sophisticated and powerful technology that is easily and cheaply deployed and has virtually unlimited and remarkably precise tracking capability." *Weaver*, 909 N.E.2d at 1199. The court further noted that

> GPS is not mere enhancement of human sensory capacity, it facilitates a new technological perception of the world in which the situation of any object may be followed and exhaustively recorded over, in most cases, a practically unlimited period. The potential for a similar capture of information or "seeing" by law enforcement would require, at a minimum, millions of additional police officers and cameras on every street lamp.
> . . . .

7

The science at issue in *Knotts* was, as noted, quite modest, amounting to no more than an incremental improvement over following a car by the unassisted eye. This being so, the Court quite reasonably concluded that the technology "*in this case*" . . . raised no Fourth Amendment issue, but pointedly acknowledged and reserved for another day the question of whether a Fourth Amendment issue would be posed if "twenty-four hour surveillance of any citizen of this country [were] possible, without judicial knowledge or supervision" . . . . To say that that day has arrived involves no melodrama; 26 years after *Knotts*, GPS technology, even in its present state of evolution, quite simply and matter-of-factly forces the issue.

*Id*. at 1199-1200 (citations omitted).

While the *Weaver* opinion presents an analysis by which the *Knotts* decision could be deemed inapplicable to the use of GPS tracking devices, it hardly demonstrates that there is settled law holding the warrantless use of such devices to constitute a search governed by Fourth Amendment standards. It is evident that the constitutionality of warrantless use of GPS technology to track vehicle movements is not "obvious" such that the admission of this evidence was plainly error. Accordingly, this issue is not one of fundamental error under the *Perry* standard that we can consider for the first time on appeal, and for that reason we do not reach the merits.

## C.    Reasonable Suspicion

Having concluded that the district court did not err in admitting the GPS evidence, we now examine whether the district court erred in concluding that this evidence, in addition to other evidence known to the officers at the time of the stop, provided the requisite reasonable, articulable suspicion that Danney was involved in drug activity so that extension of the stop to employ a drug dog was constitutionally valid.

When a decision on a motion to suppress evidence is challenged, we accept the trial court's findings of fact that are supported by substantial evidence, but we freely review the application of constitutional principles to the facts as found. *State v. Atkinson*, 128 Idaho 559, 561, 916 P.2d 1284, 1286 (Ct. App. 1996). At a suppression hearing, the power to assess the credibility of witnesses, resolve factual conflicts, weigh evidence, and draw factual inferences is vested in the trial court. *State v. Valdez-Molina*, 127 Idaho 102, 106, 897 P.2d 993, 997 (1995); *State v. Schevers*, 132 Idaho 786, 789, 979 P.2d 659, 662 (Ct. App. 1999).

The Fourth Amendment safeguard against unreasonable searches and seizures applies to the seizures of persons through arrests or detentions falling short of arrest. *Terry v. Ohio*, 392

U.S. 1, 16 (1968); *State v. Aguirre*, 141 Idaho 560, 562, 112 P.3d 848, 850 (Ct. App. 2005). The stop of a vehicle is a seizure of its occupants and is therefore subject to Fourth Amendment standards. *Id.* An officer may draw reasonable inferences from the facts in his or her possession, taking into account the officer's experience and law enforcement training. *State v. Swindle*, 148 Idaho 61, 64, 218 P.3d 790, 793 (Ct. App. 2009); *State v. Grantham*, 146 Idaho 490, 497, 198 P.3d 128, 135 (Ct. App. 2008). The reasonableness of the suspicion must be evaluated upon the totality of the circumstances at the time of the stop. *State v. Ferreira*, 133 Idaho 474, 483, 988 P.2d 700, 709 (Ct. App. 1999).

An investigative detention must be temporary and generally must last no longer than is necessary to effectuate the purpose of the stop. *Florida v. Royer*, 460 U.S. 491, 500 (1983). *See also Aguirre*, 141 Idaho at 563, 112 P.3d at 851; *State v. Gutierrez*, 137 Idaho 647, 651, 51 P.3d 461, 465 (Ct. App. 2002); *State v. Martinez*, 136 Idaho 436, 440-41, 34 P.3d 1119, 1123-24 (Ct. App. 2001). However, a routine traffic stop may turn up suspicious circumstances that justify an officer asking further questions unrelated to the stop. *Royer*, 460 U.S. at 500; *State v. Brumfield*, 136 Idaho 913, 916, 42 P.3d 706, 709 (Ct. App. 2001); *State v. Myers*, 118 Idaho 608, 613, 798 P.2d 453, 458 (Ct. App. 1990). The officer's observations, general inquiries, and events succeeding the stop may--and often do--give rise to legitimate reasons for particularized lines of inquiry and further investigation by an officer. *Id.* Accordingly, the length and scope of the initial investigatory detention may be lawfully expanded if there exist objective and specific articulable facts that justify suspicion that the detained person is, has been, or is about to be engaged in criminal activity. *Id.* It is the State's burden to establish that the seizure was based on reasonable suspicion and sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure. *Royer*, 460 U.S. at 500.

Danney does not challenge the legitimacy of the initial stop for failure to signal a lane change, and the State does not dispute the district court's finding that Deputy Clifford abandoned that initial justification for the stop and extended the detention beyond what was necessary to complete investigation of the traffic infraction. Danney's contention on appeal is that the collective knowledge of Detective Taddicken and Deputy Clifford did not rise to the level of reasonable articulable suspicion that Danney was involved in drug activity such that extension of the stop and expansion of its purpose by utilizing the drug dog was constitutionally permissible.

The detective's focus on Danney began with an anonymous tip that Danney was potentially connected to a marijuana trafficking ring. Whether information from an informant's tip is sufficient to create reasonable suspicion depends upon the content and reliability of the information presented by this source, including whether the informant reveals the informant's identity and the basis of the claimed knowledge. *Alabama v. White*, 496 U.S. 325, 330 (1990); *Illinois v. Gates*, 462 U.S. 213, 228-29 (1983); *State v. Larson*, 135 Idaho 99, 101, 15 P.3d 334, 336 (Ct. App. 2000). An anonymous tip standing uncorroborated is generally not enough to justify an investigative stop because "an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity . . . ." *White*, 496 U.S. at 329. *See also Florida v. J.L.*, 529 U.S. 266, 270 (2000). Where the information comes from a known citizen informant rather than an anonymous tipster, the citizen's disclosure of his or her identity, which carries the risk of accountability if the allegation turns out to be fabricated, is generally adequate to show veracity and reliability. *Gates*, 462 U.S. at 233; *State v. Peterson*, 133 Idaho 44, 47, 981 P.2d 1154, 1157 (Ct. App. 1999). The State acknowledges that due to the tipster's anonymity here,[1] the tip alone could not provide the requisite reasonable suspicion to support an extension of the traffic stop. Nevertheless, an anonymous tip may contribute to an accumulation of evidence that warrants reasonable suspicion. *See State v. Hankey*, 134 Idaho 844, 847-48, 11 P.3d 40, 43-44 (2000) (holding that the anonymous tip at issue, while insufficient to create reasonable suspicion

---

[1] The tipster here may not actually have been anonymous, but the evidence presented by the State requires that we presume so. According to Detective Taddicken's testimony at the suppression hearing, he received the information about Danney from a person he "interviewed," who brought up Danney's name. Since officers typically obtain the identity of people they interview, this evidence leaves open the possibility that the information came from a reliable source. Because the prosecutor did not develop this information through Detective Taddicken's testimony, however, we must treat the tip as coming from an anonymous tipster.

We also note that the prosecutor forewent other information about the tip that could have contributed to a showing of reasonable suspicion. Apparently believing that the informant's statements to the detective would be inadmissible hearsay, the prosecutor elicited vague testimony about the tip and the tipster while cautioning the detective to respond "without telling us what that person said." In actuality, an out-of-court statement introduced at a suppression hearing does not constitute hearsay if it was not introduced to show that the statement was true, but only to show that this information had been received by a police officer for purposes of demonstrating reasonable suspicion or probable cause. *See* Idaho Rule of Evidence 801(c); *State v. Bishop*, 146 Idaho 804, 813-14, 203 P.3d 1203, 1212-13 (2009); *State v. Cox*, 136 Idaho 858, 861, 41 P.3d 744, 747 (Ct. App. 2002).

on its own, was entitled to "some weight" when considered together with other facts known to the officer).

Other evidence known to the officers at the time included Detective Taddicken's discovery, in Danney's residential trash, of marijuana residue on a tissue, one plastic heat-seal bag which is a method often used to package drugs, and some sections of plastic that appeared to be cut from similar plastic bags. The officers also had information that Danney's vehicle had just returned from a trip to Arcata, California, which Detective Taddicken knew to be a "source city" for marijuana sold in Boise based on his training and previous investigations, reports from people who had told him that they had traveled to the area to pick up marijuana, and information shared by current and former members of law enforcement agencies in the Arcata area. Although there obviously could be innocent reasons for Danney's trip, the existence of alternative innocent explanations does not necessarily render the information entirely valueless for purposes of assessing the reasonableness of the detective's suspicions. *State v. Rader*, 135 Idaho 273, 276, 16 P.3d 949, 952 (Ct. App. 2000).

Danney's reaction to being stopped also contributed to the officers' suspicions. Deputy Clifford testified that from the outset of the traffic stop, Danney was "very nervous, very concerned about why I had pulled him over, kind of fidgety" to a degree that it concerned the deputy because it was "not normal behavior for a citizen on a traffic stop." While the district court specifically said that it did not take this evidence into consideration, we note that although such evidence may be of "limited significance," *State v. Gibson*, 141 Idaho 277, 285-86, 108 P.3d 424, 432-33 (Ct. App. 2005), it may contribute to a finding of the existence of reasonable suspicion. *See State v. Johnson*, 137 Idaho 656, 660, 51 P.3d 1112, 1116 (Ct. App. 2002) (concluding that defendant's excessive nervousness properly contributed to the officer's reasonable suspicion that drug activity was afoot).

Finally, we note that the length of the extension of the stop, as well as its intrusiveness, was minimal. Officer Clifford had the dog with him in his patrol vehicle and deployed the dog about six minutes into the stop, as soon as a backup officer arrived. *See State v. Martinez*, 129 Idaho 426, 431, 925 P.2d 1125, 1130 (Ct. App. 1996) (in upholding the extension of a stop to deploy a drug dog, noting that period of detention while the officers awaited the dog's arrival was very brief, approximately three to five minutes). This Court has recognized that the use of the drug-detection dog is one of the least intrusive means available to confirm or allay the

11

suspicion that controlled substances are in the automobile. *Id. See also United States v. Place*, 462 U.S. 696, 707 (1983) (subjecting suspect's luggage to a "canine sniff" was not a search); *Royer*, 460 U.S. at 505-06 (recommending use of drug-detection dogs to shorten length of investigatory detentions).

Based on the totality of the circumstances known to the officers, we conclude that the district court did not err in finding that the collective knowledge and observations of Deputy Clifford and Detective Taddicken gave rise to reasonable, articulable suspicion of illegal drug activity such that the extension of the traffic stop to deploy the drug dog was justified. While no item of evidence, standing alone, gave rise to the requisite suspicion, the combination of the anonymous tip; the discovery of marijuana residue and possible packaging material in Danney's trash; the GPS data indicating that Danney's vehicle had been in an area known as a source for marijuana marketed in Boise; and Danney's excessive nervousness after the stop, seen through the lens of the officers' training and experience, cumulated to support reasonable suspicion for extension of the stop to employ a drug dog.

### III.

### CONCLUSION

We conclude that an adequate foundation was provided for admission of the GPS evidence at the hearing on Danney's suppression motion. Because Danney did not raise the issue below and because it would not constitute fundamental error, we do not reach the merits of his contention that the warrantless placement of a GPS tracking device on his vehicle was unconstitutional. Finally, we conclude that the totality of the circumstances known to the officers justified reasonable suspicion that Danney was involved in drug activity such that extension of the stop to deploy the drug dog was lawful. Therefore, the order of the district court denying Danney's motion to suppress evidence is affirmed.

Judge GRATTON **CONCURS.**

Judge GUTIERREZ, **DISSENTING**

Because I disagree that the circumstances in this case amounted to reasonable, articulable suspicion of drug activity such that the extension of the stop (and subsequent use of the drug dog) was constitutionally permissible, I respectfully dissent. We have previously held that a motorist's Fourth Amendment rights are violated if officers lengthen a stop for a traffic violation by using a drug dog to examine the vehicle or by questioning the occupants about drugs in the

12

absence of reasonable suspicion of drug activity. *State v. Wigginton*, 142 Idaho 180, 184, 125 P.3d 536, 540 (Ct. App. 2005). *See also State v. Aguirre*, 141 Idaho 560, 563-64, 112 P.3d 848, 851-52 (Ct. App. 2005).

An examination of the record shows that, if anything, the officers merely had a generalized hunch that Danney may have been involved in drugs in some manner. As the majority points out, the anonymous tip that Danney was potentially connected to a marijuana trafficking ring was of little value. Likewise, the value of the physical evidence found in Danney's trash is diminished for several reasons. The only testimony regarding the significance of the heat-seal bags as they implicated Danney in marijuana trafficking was a conclusory, passing reference by Detective Taddicken. In addition, Detective Taddicken testified that he did not know if anyone else was living at Danney's residence when he found the items in the trash, thus there remained the possibility that the tissue and plastic were not Danney's.

Even assuming the GPS evidence was constitutionally obtained, or as the majority concludes, not fundamental error that we can review on appeal, it was much too general to link Danney to criminal drug activity. As Danney points out, there was no evidence presented that it was Danney who drove the truck to California, nor that the driver had frequented a known drug location in Arcata or the surrounding area. Moreover, Detective Taddicken did not testify with specificity as to when the vehicle left for Arcata, whether it stopped anywhere during the trip, when it arrived in Arcata, or why he believed Arcata was a "hotbed" of marijuana activity.

The evidence characterizing Northern California as a "hotbed for marijuana" was also vague and not based on concrete facts. Detective Taddicken testified that while he did not have personal knowledge of Arcata, he had received information that Arcata is a "gateway" for shipping marijuana to Boise through "prior investigations[;] speaking to people who stated they had gone to those areas," including both informants and non-informants, "some" of whom he believed were reliable and through the generalized knowledge of the law enforcement community (including Ada County and Boise city officers) that the area is known for marijuana activity. However, even had the State provided reliable evidence for the court to properly conclude that Arcata, California, was known for drug activity, there was simply no evidence linking Danney to any drug activity aside from his vehicle's mere presence in Arcata. *See State v. Zuniga*, 143 Idaho 431, 435, 146 P.3d 697, 701 (Ct. App. 2006) (noting that Zuniga's presence at a location where criminal activity had been suspected in the past was of "little significance" in

13

determining whether there was requisite suspicion to instigate a stop). *See also Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (holding that mere presence in a high-crime area is not enough to support a reasonable, articulable suspicion that criminal activity is afoot). This is simply too tenuous a link to establish corroboration of suspicion of drug activity. The implications of allowing the mere (alleged) presence in a general geographic area that conventional wisdom indicates is known for a certain criminal activity as corroborative evidence are problematic.

In addition, while the district court stated that it did not take into account the defendant's demeanor and statements (specifically his honesty as to where he was coming from) after he was pulled over in concluding there was the requisite suspicion to extend the stop, the State continues to argue on appeal that such facts support the district court's conclusion. However, consideration of this evidence involves, in part, credibility determinations and therefore must be made in the first instance by the trial court. *State v. Kimball*, 141 Idaho 489, 493, 111 P.3d 625, 629 (Ct. App. 2005) (quoting *State v. Kirkwood*, 111 Idaho 623, 625, 726 P.2d 735, 737 (1986)) ("[T]he power to judge the credibility of the witnesses, resolve any conflicts in the testimony, weigh the evidence and draw factual inferences, is vested in the trial court."). Thus, consideration of this evidence as advanced by the State is inappropriate given that the district court did not make the requisite determination as to its credibility. *See id*.

In sum, the facts known to the officer at the time of the extension of the stop fell short of reasonable, articulable suspicion that Danney was engaged in drug activity. By way of contrast, in *State v. Sheldon*, 139 Idaho 980, 985, 88 P.3d 1220, 1225 (Ct. App. 2003), where this Court concluded there was reasonable suspicion of drug activity to extend a traffic stop, the evidence amounting to reasonable suspicion implicated the defendant as being involved in drug activity to a much higher degree than was present here. Specifically, the officers had seen Sheldon's vehicle parked at a known drug house earlier that evening and watched it leave at approximately 3 a.m.; the vehicle had previously been registered to a known drug user; there was another vehicle registered jointly to the defendant and the previous owner of the vehicle who was a drug user; officers had received tips from known sources that the defendant was a drug dealer and carried a weapon; and once the stop was initiated, the officer observed that the defendant's eyes were bloodshot and glassy in manner associated with drug use. In contrast, here the officers never established specific evidence linking Danney to marijuana trafficking, but merely relied

14

upon a conglomeration of general allegations which did not amount to the requisite reasonable, articulable suspicion that is required to extend a stop. I would reverse the district court's denial of Danney's motion to suppress, vacate his judgment of conviction, and remand for further proceedings.

I further note that given the officers' knowledge of Danney's residence, his business, and comings and goings, this is a circumstance where complying with the overwhelming preference for obtaining a warrant was a realistic possibility if the officers had been able to gather evidence amounting to the requisite probable cause. As a result, the officers' reliance on an admittedly pretextual traffic stop to further investigate their hunch regarding Danney's drug activity appears, in this instance, to be an effort to circumvent the protections afforded by our federal and state constitutions against unreasonable searches and seizures.